In re the estate of NICHOLAS W. CRAFT, deceased.

[Submitted March 22d, 1915.   Decided June 22d, 1915.]

1. The burden of overcoming the presumption of undue influence, if any, arising from the relations of the chief beneficiary to the testator, was successfully met where the beneficiary and his wife, with whom the testator lived, emphatically denied ever having knowledge of the will, or that, in conversation with him, they ever spoke of a will.

2. Kindly offices and attentions of the beneficiary and his family rendered to an aged testator who made his home with them, were legitimate and not undue influence.

3. In determining undue influence, if any, exercised upon a testator, the point of time to be considered is that at which the testator executed the writing in dispute.

4. The legal presumption is that a testator was sane when he executed his will.

5. In a will contest on the ground of the testator's incapacity to make a will, evidence *Held* not sufficient to overcome the presumption of sanity.

6. A testator must be possessed of a sound and disposing mind and memory, and, where his mind and memory are sufficiently sound to enable him to know and to understand the transaction, to recollect the property about to be bequeathed and the objects of his bounty, he has "testamentary capacity."

7. In a will contest on the ground of undue influence, the caveatrix had the burden of proof.

8. In a will contest evidence *Held* to show that when he executed the writing propounded, testator possessed testamentary capacity.

---

*Mr. H. Burdett Herr* and *Mr. William C. Gebhardt,* for the appellant.

*Mr. Willard C. Parker* and *Mr. Harry L. Stout,* for the appellee.

BACKES, VICE-ORDINARY.

This appeal is from a decree of the orphans court of Hunterdon county, denying probate of the last will and testament of Nicholas W. Craft, deceased. The testator died July 25th, 1913, aged eighty-five years. More than two years before, on May 29th, 1911, he executed his will, by which he gave his estate of less than $10,000 to James T. Hoffman, a nephew by marriage, except $25, which he gave to one James W. Farley. The testator's nearest relatives were a niece—Mrs. Boiles, the caveatrix—and two nephews, one of whom lived in the State of New York and the other in the west. Probate was contested on the grounds of incompetence and undue influence. The record is not favored with an opinion of the judge who heard the cause, but it appears by the decree that the court's judgment was rested upon the former and that the latter ground was not considered necessary to be passed upon. The transcript of the testimony is very imperfect, due, as counsel says, to the stenographer, who was not proficient in this class of work. It is apparent that in many instances the witnesses are not correctly reported and that questions and answers were omitted, and therefore to the task of re-

viewing the judgment is added the further difficulty of ascertaining the true meaning of the evidence, which can only be gathered by a consideration of all that each witness testified to, and not from the sense of any particular question and answer.

I premise these remarks with the statement that the evidence discloses no exertion of undue influence over the testator, and that if the relations of the chief beneficiary to him were of such a character as in the absence of explanation, to raise a presumption of such influence, then the burden of overcoming it has been successfully met. Both the beneficiary and his wife, with whom the testator lived, emphatically deny ever having knowledge of the will, or that they in conversation with him ever spoke of one, and the history of the case bears out their denials. *Sparks' Case, 63 N. J. Eq. 242.*

And I may at this juncture pause to add that to me the will seems a just and natural one. For eight years and more the testator made his home with the beneficiary. He then went to live with the latter's mother, where he remained for three years until her death, returning at his own earnest solicitation to the beneficiary a month before the will was executed, where, despite importunity of others to live elsewhere, he said he wanted to spend his remaining days, and where he stayed until his death. He spoke of this home as the home of homes and that James (the beneficiary) had been a boy to him. There he was well cared for and happy, and undoubtedly appreciated the kindly treatment and ministrations of the beneficiary and of his family. Then why should not he, who afforded comfort and solace to this old gentleman in his declining years, be the most natural object of his solicitude and bounty? His nephews were probably as strangers to him. It does not appear that they ever gave him any attention. His niece lived in a distant city, calling occasionally to transact some small business affairs, but more than this does not appear, and for these services he expected to account. Such kindly offices as the beneficiary and his family rendered the deceased have repeatedly been held to be legitimate influences and not undue.

We turn, then, to an examination of the testimony upon which the orphans court pronounced the testator incompetent to make

a will, and we may properly start with these undisputed facts: Although the testator had reached the great age of eighty-five, he was up and about until two weeks before his death. He attended to all of his personal wants; dressed and undressed himself unaided; ate his meals with regularity with the other members of the family, and unassisted; visited his neighbors alone; visited, unaccompanied, the grave of a friend who had recently died, and in general deported himself becomingly in and about the household of which he was a member. He was ruptured and wore a truss, which he usually adjusted himself. He suffered from cancer sores, which he personally treated under the direction of his physician. This state of bodily and mental vigor stamps the testator as remarkably rugged for one of his years. The cancer from which he suffered periodically produced an accumulation of poisonous secretion in the system, which resulted in mental depression and a clouding of the mind, but these disturbances were merely transitory, for, when the secretions were freed and the spell passed, the faculties were restored and the mind cleared up. His physician says that after the attacks his mind became clear and he understood things as well as formerly. He suffered one of these spells in the winter of 1910–11 for about six weeks, ending some time in January. He had another slight attack lasting two days in April, about a month before the will was drawn. From this he did not suffer seriously, as he was up and around, and it appears that the spell did not attract the attention of the family. Judging from the symptoms and effect of the disorder, as given by the physician, the testator was not its victim on the day the will was drawn, for he says that under its influence his patient could not understand what was being told to him, could not take medicine, could not write or walk, and could not talk coherently. All of these things the testator did on that day. I have before me the original will, to which his signature is plain and as strong as one would expect to find of a man of his years. On the morning of the day the will was drawn, he walked three miles to the home of James C. Farley to seek his aid in the adjustment of some financial matters. At the request of the testator, a scrivener was sent for, who, after preparing a document, of which I will speak later, was re-

*85 N. J. Eq.* In re Craft's Estate.

quested to draw a will, and upon being asked what disposition he desired to make of his property, the testator said that he wanted it to go to James (meaning the beneficiary), and being twice asked whether he had any special bequests to make, replied in the negative. No one was in the room but the testator and the scrivener when the directions were given for the will and while it was being drafted. The scrivener says he read the will over five times and then once, but whether he read it to himself or aloud to the testator, is not made clear. A witness was called into the room and to him, in the presence of the scrivener, the testator declared the document to be his last will, and asked that the two subscribe the same as witnesses. The will was executed with all of the ceremony required by the statute, and at the instance of the testator the scrivener took it with him. No mention of it was made thereafter until it was read at the grave two years and more afterwards. The will was initiated solely by the testator. It appears that when the scrivener had finished his other affairs, the testator stated to him that he had some private business he desired to transact, and thereupon the two were left alone, and then came the directions which are embodied in the document in dispute. The first intimation of the testator's desire to make a will was given by him to the scrivener when they were in private. The proofs are satisfactory that no previous suggestions to this end had been made by anyone. The scrivener's conduct is above suspicion. He was disinterested—is a gentleman of high repute in the community, whose probity and integrity are unassailed by counsel, who, on the argument, were interrogated as to his character. I attach some importance to the standing of the scrivener upon the question of capacity, because of the improbability of one of his type drawing a document of such solemnity for a person not competent; and considerable to the undisputed fact of the will having emanated solely from the testator. That the will is the offspring of the testator's mind is emphasized by its frame. It will be observed that in the preliminary part of the second paragraph the estate is given to James T. Hoffman, and, parenthetically, "by his paying to my friend James W. Farley the sum of $25," and then the residue is again disposed of. This peculiar collocation is accounted for by

the scrivener in this manner: He says that while in the act of drawing the will, and upon reaching the point disposing of the estate to James T. Hoffman, the testator interposed, saying that he would like to have $25 go to James W. Farley. The latter had just before consented to transact some business for the testator, and it is a fair assumption that this provision was made for his compensation. Up to this point in the testimony there is little room for differences of opinion.

The other evidence in the case bearing upon the conduct and mental condition of the testator on the day of the execution of the will is not in serious conflict, but, upon its significance, and the weight to be given to it, much depends in solving the issue. [Here follows a discussion of the evidence.]

In controversies of this character, the point of time to be considered is that at which the testator executed the writing in dispute. The legal presumption is that he then was sane, and I do not find in the record, bearing upon that occasion, evidence of a character to disturb this presumption, nor to lead me to conclude other than that the testator at that time had intellect and capacity sufficient to comprehend the nature of the transaction he was engaged in, and all of the essential concomitants. His mind and memory were equal to the test as defined and illustrated by Mr. Justice Washington, in *Stevens* v. *Van Cleve, 4 Wash. C. C. 267*, and adopted as the settled construction of "testamentary capacity" in this state, as follows:

"He (the testator) must, in the language of the law, be possessed of a sound and disposing mind and memory. He must have memory. A man in whom this faculty is totally extinguished, cannot be said to possess understanding to any degree whatever, or for any purpose. But his memory may be very imperfect; it may be greatly impaired by age or disease; he may not be able, at all times, to recollect the names, the persons, or the families, of those with whom he had been intimately acquainted; may at times ask idle questions, and repeat those which had before been asked and answered; and yet his understanding may be sufficiently sound for many of the ordinary transactions of life. He may not have sufficient strength of memory and vigor of intellect to make and to digest all the

85 N. J. Eq. In re Craft's Estate.

parts of a contract, and yet be competent to direct the distribution of his property by will. This is a subject which he may possibly have often thought of; and there is probably no person who has not arranged such a disposition in his mind, before he committed it to writing. The question is not so much what was the degree of memory possessed by the testator as this, Had he a disposing memory? Was he capable of recollecting the property he was about to bequeath, the manner of distributing it, and the objects of his bounty? To sum up the whole in the most simple and intelligible form, were his mind and memory sufficiently sound to enable him to know and to understand the business in which he was engaged at the time when he executed his will?"

Much of the record deals with the evidence of the testator's physicians, neighbors and friends, who testify to facts evincing the quality of his mind and memory before and after the making of the will. I will only refer to that which relates to the latter period. His three physicians are united in their opinion that he had mental capacity. Their professional treatment of him was direct; they prescribed for and advised him personally, and he followed their instructions. The physician in regular attendance stated that he was a great man to have him in his room and talk to; that he was always glad to see him and knew him; that the testator was a great Mason and often asked about a Mr. Moore and other members of the fraternity whom he knew years ago. His neighbors testified that he conversed with them about being in New York; about mutual acquaintances, farming, gathering the crops, sowing, weather conditions, manner of farming, and things of interest in the neighborhood. Of one, who called once or twice a week, he would always inquire as to the condition of her son's health, who was ill with rheumatism. With another, he tried to negotiate the sale of the Wyckoff Hoffman $1,500 second mortgage, and with him he had frequent conversation. To this witness he told that his mortgage was to have been a first mortgage, but that he had been duped. He also tried to sell it to the beneficiary. A lady visitor at the beneficiary's house testified that she read to the testator, and that he would make comments; that she talked to him and he an-

swered rationally; that he spoke of having lived at Mrs. Hoff-
man's and that she conversed with him by the half-hour.
Another witness, a plumber, who did work at the beneficiary's
house during June, July and August, 1911, and who took his
noonday meal there, said that the testator's conversation at the
dinner table was usually between him and members of the
family, and that he had quite some conversation with a man by
the name of Apgar over old matters; that the testator was
usually around where he was working, watching the operations.
All of the witnesses for the proponent say that he was intelligent,
always knew them, conversed coherently, and that his mind was
clear for a man of his age, and nearly all—some twenty in
number—gave as their opinion that the testator was competent
to make a will, and many cite facts upon which their opinion is
based.

As against this array, the caveator produced a number of
witnesses whose evidence I will analyze in detail. [Here fol-
lows a recital of their evidence.]

The divergent views of the opinion-witnesses as to the mental
capacity of the testator is, in some instances, doubtlessly due to
the fluctuations in physical health and the resultant temporary
effect upon his mind at the times they observed him, and of
which they speak; and also to their failure to distinguish be-
tween his condition before and after the stroke of paralysis he
suffered in January of 1912, after which his mind was not as
keen as before. At most, evidence of this character is of very
little help, but if the question pressing were to be solved by it
alone, I would unhesitatingly affirm a decided preponderance
in favor of sanity. I have given it the consideration to which
it is entitled.

This extended and detailed review of the testimony leads to
the conclusion that the caveatrix has not sustained the burden
of proof cast upon her, and to the result that the testator was
competent to make a will. A persuasive element in arriving at
this decision, uppermost in my mind, is the conviction that one
who was able to respond both physically and mentally to all
other callings in life ordinarily expected of one so greatly ad-
vanced in years as the testator was, could not, in reason, be

lacking in that limited degree of intelligence and meagre capacity required by law for the exercise of this simple function.

The decree of the orphans court will be reversed and the will admitted to probate. Costs and counsel fee will be ordered paid out of the estate.