In the Matter of the probate of the Will of JOHN GLEESPIN, deceased.

1. Testamentary capacity is established by capability to transact business with sagacity and decision.

2. Kindness and attention do not, of themselves, constitute undue influence which will invalidate a will.

3. Suspicious circumstances in the conduct of a legatee for life, towards the testator, in the absence of evidence of any attempt to influence the testator in any way, will not avail to set aside his will.

4. Unreasonableness of testator's prejudices, and unfairness in the disposition of his property, will not, of themselves alone, avail to induce the court to repudiate his will.

On appeal from the decree of the Orphans Court of the county of Somerset.

*Mr. J. D. Bartine* and *Mr. G. B. Adrian*, for appellant.

*Mr. H. M. Gaston*, for respondent.

THE ORDINARY.

John Gleespin, then of Bloomington, in the county of Somerset, died on the 27th of June, 1873, in his own house at that place, leaving a last will and testament, executed by him with all the requisite formalities, on the 13th of May preceding. By it, after directing payment of his debts and funeral expenses, he gave and devised to his son-in-law, Patrick Shea, to be held by him for the use of his granddaughter, Annie Shea, the house and lot where the testator then lived, to have and use the same for his own use until his said granddaughter should arrive at the age of twenty-one years, at which time he gave and devised that property to his said granddaughter, to have and to hold the same to her and her heirs and assigns forever. In case of her death before attaining to the age of twenty-one years, he gave the house and

lot to his son-in-law, Patrick Shea, his heirs and assigns for-ever. All the rest and residue of his estate, both real and personal, he gave, devised, and bequeathed to the said Patrick Shea, to have and to hold the same to him, his heirs and assigns forever. In consideration of the gifts to Patrick Shea, he charged him to take good care of Annie, and give her that tender affection which was due to her as his child. He then appointed Patrick Shea his executor, and by that will, revoked all his former wills.

The testator's estate consisted of a house and two lots of land, on which he lived, and two other houses and lots, of the value, all together, of from $2500 to $3000. He was an old man. His age was over seventy. He had had two daugh-ters. One married Patrick Shea. She was the mother of Annie, and died on the 9th of January, 1865. The other married Samuel Aird. She died on the 28th of March, 1873, leaving three children : one an infant, another aged about three years, and the other also of tender years, at the time of Mrs. Aird's death. The testator had opposed the marriage of both of his daughters. He was opposed to Shea, because of his then intemperate habits, and to Aird, because he was a protestant. The testator was a firm Roman Catholic. After the testator's death, Patrick Shea propounded the will for probate. After a protracted trial it was, by the decree of the Orphans Court of Somerset county, admitted to probate. From that decree an appeal was taken to this court.

It is insisted, on the part of the caveatrix, Sarah Aird, one of Samuel Aird's children, that the testator had not testa-mentary capacity at the time of making the will, and that the will was the result of undue influence upon the testator on the part of Patrick Shea.

The evidence fails to show any want of testamentary capacity. The testator appears to have made two wills before that under consideration; one in 1870, and the other in 1871. By the former, he gave the house where he lived to Annie Shea, and the rest of his property to the German Catholic Church. By the latter, he divided his property equally

In the matter of the will of John Gleespin.

between Annie Shea and his daughter, Mrs. Aird. As before stated, his daughter, Mrs. Aird, died on the 28th of March, 1873. She died in his house. He had sent for her and her family to come to him from Kansas, where they were living, in December, 1872, and had forwarded to them the money to pay their expenses. They lived with him, in his house, until her death. The will in question was made about six weeks after her death. The testator, when the will was made, was sick of an organic disease, with which he had been for a considerable time afflicted, and which he then supposed would very soon terminate his life. He sent for a lawyer in Plainfield to draw his will, and, at the same time, sent for a priest of his church, living there, to administer to him the rites of the church, the pastor of the particular church to which he was attached, being at the time temporarily absent. He gave to the lawyer the instructions for his will. After it was drawn the will was read to him, and he approved of it. He told Shea whom to send for for witnesses. After the will was executed he paid the lawyer for drawing it. There was nothing whatever in the circumstances attending the making of the will, to indicate any want of capacity. He not only, before the will was drawn, mentioned Shea and his daughter in his instructions for that instrument, but he spoke of his other son-in-law and grandchildren, and, of his own accord, stated the reason he left them nothing, "because his son-in-law had not treated him right." He told the lawyer, when the latter, on being introduced to him, asked him what he wanted of him, that he wanted him to draw a will for him, and told him he had made a will but it did not suit him. The lawyer and the priest both regarded him as possessing testamentary capacity, and although, one of the witnesses, John J. Fritts, says the testator was somewhat childish, he says his condition was not different from what it had been for one or two years before that time. The evidence is, that the testator was capable of transacting business; was shrewd and firm in his bargains. On the 1st of March, 1873, he purchased some lots at a public sale for $1000, paying the

deposit of $100, and on the 1st of April following paid the balance, and took the deed. In the latter part of April, 1873, he appears to have had a business transaction with the witness, Lair, which showed clearly his ability to make his own bargains. On the day after Mrs. Aird died, he went to New Brunswick in the stage to see a Roman Catholic priest there, to get sepulture for his daughter, if possible, in the Roman Catholic cemetery at that place, and though on returning on foot he lost his way, yet he regained it, and when taken up by Aird and Foley, who overtook him, he had almost reached his home. One of the witnesses says he was within about a quarter of a mile of it. When taken up he gave, as he did afterwards, a connected and accurate account as to how he came to lose his way. The evidence leaves no doubt, in my mind, that he possessed testamentary capacity when the will was made.

The charge of undue influence rests on the fact that Patrick Shea, his son-in-law, who, immediately after the death of Mrs. Aird, removed with his family from Cranford, in Union county, where he had been residing, to the house of the testator, where he continued to live up to the time of the testator's death, a very short time before the will in question in this suit was made, consulted with the priest at Plainfield, as to how he should get from Judge Cowenhoven, of New Brunswick, the will which the testator had made in 1871, and which had been left with Judge Cowenhoven, who drew it; that he subsequently went to that gentleman and asked for the will, and on his request being denied, had the will read to him; that he afterwards brought the testator to Judge Cowenhoven's office, and the will then was delivered to the testator; that he went to Plainfield and got the priest there to go to the testator, stating that the latter was very ill and requested his religious offices, and that the same day he got Mr. Coward, the lawyer who drew the will, to go to the testator's house to draw the will, and that Shea and his family, after they came to live at the testator's house, were unwilling that the testator's friends should see him.

The evidence shows that Shea, who, when he married the testator's daughter, was intemperate, had wholly reformed from that time. While Shea lived at Cranford, the testator visited him. When Mrs. Aird died, Shea and his family went to live with the old man, and the evidence is, that the relations between Shea and the testator were, from that time, of the most amicable character. He spoke of the kind care and attention he received at the hands of Shea's wife. That he disliked his son-in-law, Aird, is beyond all question. In thirteen years after Aird's marriage, Aird, as he admits, never spoke to the testator, nor entered his house. Although his wife, on one or two occasions, had visited her father, he had received her with coldness. In his will of 1870, made when his daughter had been married to Aird more than seven years, the testator gave no part of his property to her, but gave it all to Shea's daughter Annie (his grand-daughter) and the church. Though, in December, 1872, he sent for Aird and his family, and they came to live with him, and continued to do so until Aird's wife died, there was no cordiality between him and Aird. Aird says, on this subject: "As to my wife and children, he seemed to have all the attachment that a father could have to his children and grandchildren; to myself, the conversation was friendly, but not much." After his wife's funeral, Aird left the testator's house, taking his children with him. Though he remained in the village for two weeks after the funeral, it was not at the testator's house, but at a house directly opposite. The night after the funeral of his wife, he did not sleep in the testator's house. He says: "I left the house on the 1st of April; I considered I had no ties with Mr. Gleespin; my children were not there, and my wife was dead." Again, he says: "I had concluded, after my wife's death, and after I had got my thoughts collected—I had concluded that I must remove from Mr. Gleespin's house; my children were small, they required a mother's care, and that they could not get in Mr. Gleespin." He did not tell the testator that he intended to leave him, and he did not bid him good-

bye when he left. Though he speaks of three visits to the house between the 1st of April and the time of the old man's death, his errand, on two of the occasions, the first and last, seems to have been to get a tool chest he had left there. At the second, he appears to have had no conversation with the testator, beyond asking him as to his health.

The testator, as before stated, purchased some real estate on the 1st of March, 1873, on which he paid a deposit of $100, at the conclusion of the sale, and was to pay the balance, $900, on the 1st day of April following. He had provided the money, and had given it to Mrs. Aird for safe keeping. She had given it to her husband, and he had deposited it in his own name, in a bank in New Brunswick. On the day after his wife's death, he and Foley went to New Brunswick, and drew the money from the bank, and he then insisted on retaining $100 of it, to pay the expenses of his wife's funeral. To this, the testator objected, because he had to pay the money for the property on the 1st of April. It was suggested that he should give his note for $100, on account of the balance of the purchase money. He finally gave Aird the $100, and the understanding was, that Shea was to go to Cranford, the next day, and borrow that sum for the testator. Matthew McNally heard the conversation. He says he saw Aird, the old man, and Foley, talking about the $100; that the old man did not want to let the money go out of his hands; that he said he thought Aird must be a poor man, to come so far (from Kansas), and not have money enough to bury his wife. Shea had not then gone to live with the testator. It is very clear, that there was ill feeling on the part of the testator toward Aird. This appears to have been increased by the fact that the latter not only "gave away," as the testator termed it, his infant child, but gave it to a protestant woman, at which the testator expressed his indignation. There can be no doubt, that Aird did give the custody of that child to a Mrs. Wheelan, a protestant, on an understanding between them, that she was to adopt it as her own. Such a state of feeling thus engen-

dered on the part of the testator towards Aird, sufficiently accounts for the will under consideration. Shea is dead. He was accidentally drowned while the testimony was being taken in the Orphans Court, and was not sworn as a witness. His explanation of the facts relied on as proof of undue influence, is therefore not in the evidence. There is no proof of any influence on his part, except what is deduced from those facts, and they are, at most, suspicious circumstances. *Den.* v. *Gibbons*, 2 *Zab.* 117. He does not appear to have attempted to influence the testator in any way. The charge made in this connection, that the priest at Plainfield conspired with Shea to induce the testator to make the will in question, is entirely unsupported by the evidence. Nor does there appear to be any foundation for the charge that Shea and his family denied the testator's friends access to him. The testator chose to give part of his property to his granddaughter, Shea's child, for whom he had provided in both of his former wills. She was afflicted with what it was apprehended would prove to be an incurable lameness, which the testator feared would incapacitate her from earning a livelihood. The rest of his property he chose to give to Shea, who cared for him, and whose family ministered to his wants. That he did not choose, under the circumstances, to give any part of his property to Aird or his children, is not surprising, in view of the relations existing between him and Aird when the will was made. The unreasonableness of his prejudices and the unfairness of his disposition of his property, cannot, of themselves alone, avail to induce the court to repudiate his will. He had testamentary capacity, and is not shown to have been deprived of his free agency by undue influence. The instrument executed by him as his will, with the requisite legal formalities, must therefore stand.

The decree of the Orphans Court will be affirmed.