OF

## THE STATE OF NEW JERSEY.

### MAY TERM, 1889.

ALEXANDER T. McGILL, ESQ., ORDINARY.

ABRAHAM V. VAN FLEET, ESQ., VICE-ORDINARY.

JAMES O'BRIEN, appellant,

*v.*

EDWARD DWYER and MARY DWYER, respondents.

1. The point of time at which testamentary competency is to be tested, is that of the execution of the will. The antecedent and subsequent condition of a testator is chiefly important as bearing upon that epoch.

2. A testator will be held to have testamentary capacity when it appears that he can comprehend the property he is about to dispose of, the objects of his bounty, the import and meaning of the business in which he is engaged, the relation of each of these factors to the others, and the distribution that his will makes.

44                                                    [689]

3. A will executed by a consumptive five hours before she died, sustained where it appeared that at the very time of its execution the testatrix possessed the capacity above defined.

On appeal from Hudson county orphans court.

*Mr. James F. Minturn* and *Mr. Leon Abbett,* for the appellant.

*Mr. John C. Besson,* for the respondents.

THE ORDINARY.

This case presents the question whether Hannah Dwyer, who died on the 16th day of December, 1886, of pulmonary consumption, possessed capacity, five hours before her death, to make the will in dispute.

The will is in favor of her husband and his daughter, to the exclusion of the appellant, her only brother and next of kin. It devises real estate, valued at about $3,000, and bequeaths personal property, worth less than $300. The property was derived from the mother of the testatrix, who died in 1883, leaving her estate to her two children, Hannah and James O'Brien, and consists mainly of tenement-house property in the city of Hoboken.

At her death, the testatrix was thirty-one years old. She had been married about four months to Edward Dwyer, an itinerant tea merchant. Dwyer and his daughter boarded with the O'Briens for thirteen years immediately preceding his marriage to the testatrix, from a time shortly after the death of Dwyer's first wife, when his child was little more than three years old. From that time the child had been the special care of Hannah O'Brien, had been trained and educated by her, and was the recipient of her affection. Dwyer was about nine years his second wife's senior. He had been attentive and kind to her for years before he became her husband, and was affectionate and loving to her after he married her. The testatrix was ill for several weeks before she died, and during her illness Dwyer abandoned his business and devoted his entire time to her care.

The appellant, James O'Brien, was two years his sister's junior. He had not married, but had made his home with his

O'Brien v. Dwyer.

sister and her husband in one of the houses that belonged to his
sister and himself. He appears to have enjoyed a full share of his
sister's affection. The only shadow of disagreement that seems
to have existed in the family thus composed, was Mrs. Dwyer's
occasional reproach of her husband when he would accuse the
appellant of intemperance and irregularity in his habits, and
that amounted to little more than remonstrance. It does not,
however, appear that such reproaches disturbed the affectionate
relations that existed between Mrs. Dwyer and her husband, and
his daughter.

The evidence credibly establishes that the testamentary dispo-
sition of the testatrix immediately previous to the execution of
the disputed instrument was in favor of her husband. On the
14th of December, two days before her death, she gave Dwyer
authority, in writing, to draw some money from her account in
a savings bank. The bank was unwilling to honor her order
until her signature should be attested by some one with whom
its officers were acquainted. John R. Wiggins, a merchant of
Hoboken, of unexceptional character and standing, was agreed
upon as a proper witness to the signature, and, on the evening
of the day indicated, he visited Mrs. Dwyer. When he called
at her residence, she was seated upon a lounge, and, although
evidently an invalid, was bright and talkative. He says that he
then thought that she would live three or four months; that she
had one or two fits of coughing while he was there, but had suf-
ficient strength to walk to a table, signed the paper that he was
to witness, and returned to the lounge, unassisted. He further
states that he remained in conversation with her for more than
an hour, and that in that conversation she told him that during
her sickness her husband had been "kind," "faithful" and
"loving" to her, and "that his business had gone behind," and
she expressed to him a hope that she would recover, and a desire
to make a will in her husband's favor. Continuing, this witness
says:

"She said she desired to reward him for his services to her, his loyalty and
kindness to her; then she commenced talking in a general way about the rela-
tions between husbands and wives; that she thought *that* the most sacred rela-

O'Brien *v.* Dwyer.

tionship upon the globe; she said her husband had been her best friend even before they were married; that on three different occasions they were to be married, but that death intervened every time; her mother died at one time, and some one else died at another time, and in consequence the wedding was postponed; she said that but for her husband's prudence and wisdom in man-aging the estate for her and her mother, that the estate would have been dis-sipated; that it was largely through his wisdom and care that the estate had increased in extent, and she thought that it was her duty, before she died, to make a will giving him what she had, both real and personal; I think she said she had a brother and had cousins, and she would not like to see other parties come in and 'take away what I think should properly go to my husband, and as soon as I get a chance I will make a will willing all that I have to Ed.'"

The day following this conversation the testatrix was much worse, and, at the solicitation of a neighbor, a priest was sent for, who administered to her the last rites of the Roman Catholic church. After that visitation the fortitude that had sustained her seemed to succumb to her disease, and she became almost unconscious. Her husband says that she repeatedly asked to have a lawyer summoned, and that in the evening John C. Besson (a solicitor of this court of unquestioned integrity) was sent for, and that between seven and eight o'clock he waited upon Mrs. Dwyer. As to his interview with the testatrix, Mr. Besson testifies as follows:

"I met Mr. Dwyer, and he told me that his wife wanted to make her will; I went into the room where she was lying in bed; I found her in a very low state; she was very sick—seemed to be somewhat in a stupor; he raised her up and told her that Mr. Besson was here, and she seemed to revive a little; then I asked her if she wanted to make her will; she seemed to nod her head as an indication that she did; I asked her how she wanted to make her will, and she made an effort to speak and said something which I couldn't understand; he interpreted to me, and said that she wanted to give her prop-erty to him and his daughter—Mamie, I think they called her; I then said to him that as she was in such a state, that I would not be willing to sign a will as a witness that night; that I thought she ought to be left to rest during the night, and that I would prepare a will for her, as he told me that she had said she wanted it, and that I would come in the morning, and that in the meantime he could send for the doctor and have him there; that it was a case that might be doubtful whether she was in a condition to make a will or not, and that I would not consent to be a witness unless the doctor was present to examine her and see her condition."

O'Brien *v.* Dwyer.

Another circumstance is put in evidence as indicative of her condition that evening. An hour after Mr. Besson left, the appellant came from New York, bringing with him one Josephine Kiely, who had been an acquaintance of the sick woman. In the presence of Mr. Dwyer and of a Mrs. Hanka and one John Powers, who were neighbors, and Edward Rogers, who was a friend of Mr. Dwyer, O'Brien took Miss Kiely to his sister's bedside, and said to his sister that "Joe Kiely" was there, and asked his sister if she knew her. There is some contradiction between the witnesses at this point. O'Brien says that his sister replied· to his question, "What? Who is Joe Kiely? I don't know Joe," and that he explained, "Joe, of Rondout," and she answered, faintly, "No, I don't know Joe." Mrs. Hanka, who was produced as a witness by the appellant, says of the same occurrence that Miss Kiely came into the bed-room and asked Mrs. Dwyer if she knew her, and Mrs. Dwyer replied in the negative, and James O'Brien then said, "Here is Joe; don't you know her?" and Mrs. Dwyer replied, "No;" and that after Miss Kiely had gone, Mr. Dwyer talked to his wife and said, "Don't you know Joe?" she replied, "No;" and upon his saying, "Don't you know one of your best friends?" she said, "No, I don't know; who is Joe?" but at the same time said, "I know Mrs. Hanka," and about the same time spoke to her husband and said, "Is that you, Ed?"

John Powers, who was also produced as a witness by the appellant, and with whom the appellant at the time the testimony was taken resided, says that O'Brien said, "Joe; don't you know Joe?" and Mrs. Dwyer replied, "No; who is Joe? I don't know Joe; who is she?" and O'Brien then said, "Don't you know Miss Kiely, from Rondout, your friend?" and she replied, "No, I don't know." This witness says that at that time Mrs. Dwyer's mouth was opened and her eyes were fixed so that she could not move them. Dwyer does not speak about his wife's failure to recognize Miss Kiely, but he does say that Miss Kiely had spoken discouragingly of her recovery, and that his wife, in consequence thereof, disliked the woman. The witness Rogers, produced by the respondent, says that when O'Brien

introduced Miss Kiely, Mrs. Dwyer said, "I don't know Joe
Kiely; I don't want to know Joe Kiely; but I know Mrs.
Hanka."

Whatever may be the truth as to this matter, whether there
was an intelligent refusal to recognize Miss Kiely because of
some dislike, or whether there was a failure to recognize her, the
fact remains that, though then weak, faint and almost unable
to speak, Mrs. Dwyer knew Mrs. Hanka, and called upon her
husband. The will was executed twelve hours after this occur-
rence, at half-past eight o'clock on the morning of December 16th.
In *Sloan* v. *Maxwell, 2 Gr. Ch. 563, 573*, Chief-Justice Ewing,
sitting in the prerogative court for the Ordinary, said: "The
point of time at which the testator's competency is to be tested
is that of the execution of the will; his antecedent or subsequent
condition is chiefly important as it may bear upon that epoch.
And we naturally resort, in the first place, to the subscribing wit-
nesses; because they have seen him at the decisive period, and
because the law expects from them peculiar care, caution and
circumspection; presuming from the fact of the attestation that
they believed him competent, as, otherwise, they ought not to
have given countenance to a deceptive instrument." Of the exe-
cution of the will, Mr. Besson, who is one of the subscribing
witnesses, says:

"In the morning, I returned about half-past eight, and met Doctor Elder
going in as I arrived at the door; we went up stairs and into the room where
she was; she was raised up, and seemed to be brighter than she was the night
before; I asked her if she wanted to make her will; she said 'yes;' I asked
her how she wanted to make it—what she wanted to do with her property;
she replied, 'My husband and Mamie;' I asked her if she wanted to give her
property to them equally; she said 'yes;' I then read the paper to her
slowly and distinctly, and after that I called Doctor Elder aside and asked
him what he thought of the case, if he thought she understood what she was
going to do; he said he thought she did; I then laid the paper on a book and
gave her a pen to sign it; she took hold of the pen, but her fingers were
swollen and stiff, and she could not move the pen; I then said, 'Make a mark,
and it will do as well;' she refused for some time to make a mark; she wanted
to write her name, but she finally made the mark; I then asked her if she de-
clared this to be her last will and testament and desired the doctor and myself
to sign as witnesses, and she said 'yes;' it was then signed; she showed con-

siderable power, I thought, in her effort to write her name rather than make her mark ; I was satisfied in my own mind that she knew the nature of the act and knew what she was doing, though she was in a very low state."

Mr. Besson further says that the testatrix could not sit up, and was, consequently, supported by her husband, and that while she could grasp the pen she could not guide it. Marks appear upon the will that were made by her with the pen in her efforts to write her name. Doctor Lorenzo W. Elder, the other subscribing witness, is a well-known physician of Hoboken, of most excellent repute. He has been in the continued practice of his profession for upwards of forty-five years. He had prescribed for Mrs. Dwyer only once, and that was about two months before her death. He was not her attending physician. During her last illness she had been visited occasionally by a Professor Hamilton from New York. Doctor Elder says that he went to Dwyer's, on the morning that the will was executed, for the express purpose of conferring with Mr. Besson. When he saw Mrs. Dwyer he thought that she was *in extremis*. He says that although her condition was very low, she could speak by being held up a little, and when Mr. Besson asked her if she wished the doctor and him to sign as witnesses to the will, she distinctly replied " yes." He says that she made a " desperate " effort to sign her name, but could not do it, and that she was so weak and tremulous that her hand had to be guided in making her mark ; and, further, that she seemed to understand that she wished to sign the paper before her, but he did not think that she was then capable of " investigation or thought." Later, he says : " I didn't think that she was capable of considering how she wished to dispose of her property at that time." And yet later, he says : " She was gasping for breath ; she was not in condition to think, to exercise her mind at that time." Edward Rogers was present when the will was executed. He says that the testatrix was " pretty low," but could talk ; that she made considerable effort to sign her name, but failed, and that he understood her to say to Mr. Besson, " I leave everything to my husband and Mamie." He says that she did not talk very plainly, but he could understand what she said. After the will

was executed, he says that she asked for Mamie, and when Mamie came in the room, said to her, " Mamie, be a good girl ; I have provided for you ; ¡I have brought you up." Mary Dwyer, who is sixteen years old, testifies that after Mr. Besson and Doctor Elder left the house she was called in to her step-mother, who told her to be a good girl, and do as she (Mrs. Dwyer) had taught her to do, and that she (Mrs. Dwyer) had made a will. '

These are all the witnesses who testify to the condition of the testatrix at the time the will was executed. She was then undoubtedly *in extremis*. Five hours later she died. The death immediately resulted from exhaustion. The single question to be now determined from the testimony is, whether, notwithstanding this condition of her body, her mind, at the time of the will's execution, could comprehend the property that she was about to dispose of, the objects of her bounty, the import and meaning of the business in which she was engaged, the relation of each of these factors to the others and the distribution that she had determined to make. She was not called upon to comprehend property with which she was not familiar. It was that which she had dealt with and known for years. The natural objects of her bounty were immediately about her, and few. The import and meaning of a will, and its relation to the objects of her bounty and to her property, had lately been considered by her, and but thirty-six hours before she had resolved upon the very distribution that she then made. Hence, the mental effort at the execution involved, mainly, memory of that which had been previously considered and determined upon, added to consideration whether her former conclusion should be adhered to. The difficult mental operations of investigating, considering and adjusting claims upon her, which usually attend the initiative steps of will-making, had been performed by her while she was in strength. Counsel for the appellant lay much stress upon the opinion of Doctor Elder, that Mrs. Dwyer was incapable of consideration, investigation and thought. I cannot but think that, in giving this opinion, the doctor referred to the ability of the testatrix to deal with the subject of will-making if it had been new to her, or with any difficult subject demanding a close and con-

O'Brien *v.* Dwyer.

tinued application of the mind, rather than to her ability to deal
with the familiar and already-considered subject which was then
before her, for, with reference to the task then before her, he
advised Mr. Besson that he thought she understood what she was
doing.   Any other construction of the doctor's language would
subject him to criticism for having given contradictory opinions,
and for failing to protest against the execution of the document
in dispute by one who did not possess ability to execute it, and
for participation in the execution of that document by such a
person.   In fact, for doing that which the law, according to
Chancellor Vroom, presumes he would not do.   It appears clear
to me, from the pertinent and intelligent answers of the testatrix
to the questions of Mr. Besson, her persistent efforts to sign her
name, and her final admonition to her husband's daughter, testi-
fied to by Rogers and Mary Dwyer, that she possessed both mind
and will and had sufficient capacity to make the disputed instru-
ment.   The near approach of the testatrix to death does not
require a different conclusion.   That fact excites to a cautious
weighing of the circumstances which establish her actual mental
condition, but it does not change the reality of that condition:   In
*Andrews's Case, 6 Stew. Eq. 514, 517,* much reliance was placed
upon the testimony of Dr. Theodore R. Varick (now dead) that
in his extended professional experience the intellect of a con-
sumptive " has remained intact to the last." The case before
me does not seem to be an exception to the rule that was thus
experienced.

The proofs satisfy me that Mrs. Dwyer possessed sufficient
capacity to make the instrument offered for probate, and I will,
therefore, affirm the decree of the orphans court.