In the matter of the estate of PATRICK MANNION, deceased.

[Decided November 15th, 1915.]

1. The fact that a testator, on the occasion of the execution of his will, made publication of it before he signed it does not invalidate it.

2. The rule of law as to testamentary capacity in cases where habitual intoxication on the part of the testator has been shown, is that there will be no presumption that incapacitating drunkenness existed at the time of the execution of the will.

3. A man may habitually indulge in intoxicants and yet possess testamentary capacity if at the very time of the execution of the will he was able to and did clearly comprehend the nature and effect of the business in which he was engaged.

4. Under the evidence in this case, it was *Held* there was no adequate foundation for the claim that the decedent had insane delusions as to the objects of his bounty.

5. The influence acquired over a testator by kind offices, unconnected with fraud or contrivance, is lawful and proper.

On appeal from the prerogative court. On *caveat* against probate of will.

The will was admitted to probate by the surrogate of Hudson county, and on appeal therefrom by the caveator, the orphans court of that county decreed the dismissal of the appeal. From that decree the caveator appealed to the prerogative court, which affirmed the decree of the orphans court. Probate was contested by testator's brother John. Affirmed.

*Mr. Merritt Lane,* proctor for and of counsel with the appellant.

*Mr. David F. Edwards* and *Mr. Theodore Rurode,* proctors and of counsel with the respondents.

The opinion of the court was delivered by

VREDENBURGH, J.

The validity of the testamentary disposition of the property of the deceased, involved in this appeal, is attacked by the caveator on the ground, *first,* that the writing was not formally executed in the manner prescribed by law, in that, *publication preceded the signing; secondly,* that the testator did not at its execution possess the mental capacity to make a will, and that he was possessed of such insane delusions as to the objects of his bounty as to make the will ineffective; *thirdly,* that the will was the product of undue influence exerted upon the testator at the time of its execution by George A. Bowman, the principal beneficiary under it.

The specific point made in relation to the formal execution of the document is based on the fact that the subscribing witness, Mr. Lubell, testified the testator made publication of the instrument before he had signed it, and it is insisted that this invalidated the will.

While it is true the witness in the beginning of his evidence made this statement, yet, in continuing his testimony, he further clearly stated that the testator also declared, after he had signed the will, that it was his last will and testament. His precise language, after his recall and before the case was closed, was, that *after* the testator had *signed* the will by making his mark,

"I asked him, 'Do you acknowledge this to be your signature?' and he said, 'Yes,' and I said, 'Do you declare this to be your last will and testament?' and he said 'Yes,' and I said, 'Do you desire us to subscribe as witnesses to this paper as your last will and testament?' and he said, 'Yes.' After that we [meaning the witnesses] signed."

That this was a true rehearsal of the occurrence is fortified by the language of the attestation clause, which was faultless, and recited in the usual form, as follows:

"Signed, sealed, published and declared by the said Patrick Mannion as and for his last will and testament," &c., thus furnishing *prima facie* evidence that the *signing preceded* the publication.

The witness is a reputable lawyer of this state, and no reason is given why his testimony should be discredited, and no effort was made to impeach his testimony.

But even if it had appeared conclusively by the evidence that the only publication of the will by the testator had *preceded* his signatory act, such circumstance would not have been legally sufficient to invalidate the will.

This court thoroughly considered the question in the case of *Lacey* v. *Dobbs (1901), 63 N. J. Eq. 325,* and there expressed the opinion that "the order of the requisites to the execution of a will is not material. The testator may declare the writing to be his will *before,* or *after,* or *contemporaneously,* with the making or acknowledging of the signature. But *attestation* is a different matter."

Subsequently (in 1910), this court, in the case of *Bioren* v. *Nesler, 77 N. J. Eq. 562,* approved and reaffirmed this construction of the supplement of March 12th, 1851—the "act concerning wills." In speaking of the order of succession of the requisites to the execution of a will with regard to the *attestation* clause, the court held that it was essential to the validity of a will that everything required to be done by the testator should precede in point of time the subscription or *attestation* of the two witnesses, but recognized and left unquestioned the soundness of the statement of the law in its previous opinion in *Lacey* v. *Dobbs*—that publication by the *testator* might legally either precede or succeed in point of time his signature.

This construction of the act concerning wills has thus, *authoritatively,* settled that the testamentary document is not complete until the testator has signed or acknowledged his signature, and declared the paper to be his will, and the attesting witnesses have also duly subscribed it, but that it is wholly immaterial whether the testator made such declaration or publication *before* or *after* or *contemporaneously* with the making or acknowledging of his signature.

We conclude, therefore, that the first ground taken by the caveator against the validity of the paper in question, to wit, that its publication by the testator preceded his signing of it,

is without support both in respect to the facts of this case and the law applicable thereto.

The testator's property disposed of by his will was of the simplest character and easily understood by him. It consisted, with the exception of some trifling articles of personalty, of cash deposited in four savings institutions. This money he had earned in small sums in the course of about thirty years of exposed work in the several positions of deckhand, bridgeman and gateman on the ferry-boats of the Pennsylvania Railroad Company at their ferries over the Hudson river between Jersey City and New York. He had begun there to work first as a mere bootblack, when about seventeen years of age, and had by thrift and frugality accumulated and saved several thousands of dollars. He had thus shown ample mental ability and foresight to earn and save his wages against the time of need when his family and himself might be driven by necessity to use it. He was about forty-five years old when he executed the will, at the prime of life when mental capacity is ordinarily at its highest mark.

The caveator does not question the capacity of his thrifty brother to acquire and save and invest money, but challenges his capacity to dispose of it properly when his own (the caveator's) selfish interests are concerned.

The testator's wife and only child died suddenly in July, 1911. His home was thereby broken up, and he went, in a few months thereafter, to live in New York City at the house where his brother, John, and his wife lived. The testator, who was then alone in the world, naturally turned to his only brother for companionship and consolation under the double affliction he had just suffered. That it had a serious effect upon his after life cannot be doubted. While the caveator is an interested witness, and his statements, in the absence of the decedent to contradict them, are to be received with caution, yet it is probably true, as stated by John, that Patrick became intemperate in drinking. John testified that Patrick came under the influence of liquor— to use his precise expression—"pretty much all the time," and that on one occasion, about three months after his wife's death,

Patrick said to him that "he was going to drink himself to death so he'd be with her." If John, while the testator was living in the house with him after his wife's death, had treated Patrick with kindness, instead of brutality, it is probable the present document would have been very differently framed. But it is shown clearly by the evidence that testator was maltreated and abused by John during the few months they lived together before the making of the will.

Mr. Thomas Pratt, a ticket-seller for the Pennsylvania Railroad Company, an officer employed by that company, a disinterested person, when called as a witness, stated that after the testator went to live with John, the witness often saw the former, who found fault about the way John and his wife treated him, and I quote from his testimony as follows:

"And then one day he come to me with his eyes blackened, and he was bunged up, more or less, and it looked to me as if he had been in a barroom fight, and I asked him what was the matter, and he said he had an argument at the house, and I said, 'You did not get that in an argument,' and he said they had a little scrap, and when he went he slammed the door, and I said 'Did the door hit you in the eyes and bung you up like that?' and he said, 'No, Betsy called me back' (that is what he called his brother—afterward I learned his name was John), and he says Betsy called him back and one of them Betsy, or his wife, held him while the other beat him."

The appearance of testator with his blackened eyes-certainly corroborated Patrick's statement that someone had used violence toward him. John, when called afterwards in the case, made a very brief denial of the assault by him, but his wife, who was also charged with having taken active part in beating Patrick, was not produced as a witness, and has not contradicted the statement. Other witnesses testified to hearing testator make statements respecting his treatment by his brother, John, while living with him, similar in substance to those contained in the second clause of the will quoted below.

It is shown clearly in the testimony that Patrick was a frail man and of so weak physique that the boat officers changed his position on the boats from exposed to unexposed places, and he was probably no match for John in any quarrel or fight.

When testator came to dictate his will, we see by its terms that John's treatment of him had made a very deep impression upon him. This is manifest upon its inspection. On its first page is a clause reading as follows:

"*Second.* To my brother, John Mannion, I give and bequeath the sum of one hundred ($100) dollars, which sum I consider extremely liberal, in view of the shameful way he has always treated me, robbing me of my personal belongings whenever he could, and pawning them so he could raise money for drink, and cursing and abusing me generally during the time I boarded with him, paying his rent and meeting all his household and other expenses."

We have no reason to doubt that this solemn testamentary declaration was founded on fact. At all events John's conduct toward the testator had occurred but a few months previously and was fresh before testator's mind.

Is it within the range of reasonable probability to suppose that Patrick when he came to make his will had any delusion with regard to such violent treatment?

The will was executed at about one o'clock P. M., on June 14th, 1912. The evidence clearly shows that at that time the testator had not been drinking intoxicants but was entirely free from their effects. He died on June 30th, 1912. His attendant, James Daere, testified that on the morning of June 14th, 1912, he gave him several glasses of milk, and that only one of them had any whiskey in it, and in that witness put two spoonfuls, because the testator was not eating anything, and he said he would like to have it. He appeared to look to him that day the same as any other day. "He was sick, but I did not see anything else the matter with him."

The rule of law as to testamentary capacity in cases where habitual intoxication has been shown, is that there will be no presumption that incapacitating drunkenness existed at the time of the making of the will (*Koegel* v. *Egner, 54 N. J. Eq. 623*), and that a man may habitually indulge in intoxicants and yet possess testamentary capacity if, at the very time of the execution of the will, he was able to, and did, clearly comprehend the nature and effect of the business in which he was engaged. *Fluck* v. *Rea, 51 N. J. Eq. 233.*

In *Bannister* v. *Jackson, 45 N. J. Eq. 707,* the learned ordinary thus expressed himself, viz.:

"My conclusion, after a careful examination of this case, is, that at the time the will in dispute was made, Mr. Bannister's habitually excessive indulgence in strong drink had not produced a fixed mental disease sufficient to destroy his testamentary capacity, and that at the very moment of the execution of that document he was not so intoxicated that the act in which he was engaged was vitiated."

So, in the case *sub judice,* we think, there is no foundation in the evidence for the claim that the testator's indulgence in strong drink had produced any fixed mental disease in him, certainly not such as was sufficient to impair his testamentary capacity; nor do we think there was sufficient foundation under the testimony for the claim that he was possessed of insane delusions as to the objects of his bounty.

On the contrary, the evidence abundantly shows, especially that of Mr. Lubell (a subscribing witness to and draftsman of the will), who took his instructions carefully from the testator but a few moments before it was finally executed, that immediately before and at the very time of the execution the testator was able to, and did, clearly comprehend the nature and effect of the business in which he was engaged. Even if his mind had been at previous times affected because of the excessive use of alcohol, the proof is convincing that at the hour of the execution of the will his mind was clear enough to appreciate what he was doing, to know the proper objects of his bounty and to desire and intend that those whom he named in his will should be the recipients thereof, as well as to appreciate that he was disposing of his property, the nature and amount of which he fully comprehended. We think he had, under our decisions, sufficient mental capacity to make a valid will.

There was a vast amount of important testimony given on this subject sustaining testator's mental capacity to make the will, but the evidence has been so fully collated in the opinion sent up from the orphans court, as well as, to some extent, in the opinion of the learned vice-ordinary, that I refrain from repeating it.

*86 N. J. Eq.*　　　　　In re Mannion's Estate.

As to undue influence there is no proof that Bowman ever exercised any influence. He was asked by testator to get a lawyer, · which he did, but offered to go out of the room while instructions were being given, and was expressly detained by the testator. He did not come back even to attend the execution of the will.

The evidence established beyond question that he had been a faithful friend to the testator from the time the latter had been a mere bootblack, and had advised him to save his money and place it where it would, itself, earn money. It was to his paternal interest in him that the testator attributed his own success in earning, preserving and investing his money.

The fifth clause of the will impressively reflects the testator's state of mind toward Bowman, and the reasons prompting the bequest to him, in the following words, viz.:

"*Fifth.* To my good and true friend, Geo. A. Bowman, of number [residence], who has cared for and watched over me, for the past twenty years as a father over his child, I give and bequeath," &c.

It was as true with the decedent as it is with humanity in general that at the last those friends who most impressed him with their love and kindness remained longest in his memory and held the strongest claims upon his testamentary gratitude.

Influence acquired over a testator by kind offices, unconnected with fraud or contrivance, is lawful and proper. *In re Gleespin's Will, 26 N. J. Eq. 523; 3 Bouv. (Rawle's 3d Rev.) 3352 (1914)*, and cases cited there.

The decree appealed from should be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, VREDENBURGH, WHITE, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR—15.

*For reversal*—None.