Charles C. Trelease by order of the court appointed as the next friend of Louise G. Oswald, an alleged incompetent, brings this bill to set aside an inter vivos trust made by Louise G. Oswald with the defendant, F. Arnault Seidler, *Page 491 
on or about August 15th, 1941, upon the ground that she was incompetent to make such deed at the time of its execution and for sometime prior thereto.
The complainant is the widow of Karl Oswald who died March 28th, 1941, leaving his entire estate to complainant, consisting of both real and personal property of an approximate value of $200,000. She had been married to the deceased for thirty-one years. No children were born of the marriage, and from the evidence it appears that the complainant and her husband lived very happily together in a world by themselves and exclusively for each other.
The shock occasioned by the death of her husband produced in complainant such grief and mental anguish that she no longer desired to live and attempted self-destruction on April 15th, 1941, and was taken to the Orange Memorial Hospital. Upon her discharge from that institution the defendant brought her to his home. Later, and on or about August 27th, 1941, on the certificate of two physicians as provided for by R.S. 30:4-30,et seq., she was committed to Overbrook Hospital on the order of the Essex County Court of Common Pleas, from which institution she was discharged as "recovered" on October 7th, 1943. Such an order is evidential on the issue here raised. Coombs v. Witte,104 N.J. Law 519; 140 Atl. Rep. 408. But where a person so committed is presumably incompetent, the presumption is not conclusive. The inquiry by that court was whether Mrs. Oswald should be confined in an institution, and not whether she was incompetent to manager her affairs. Only by a jury upon a commission from this court can a person be declared as incompetent and be divested of all power and control of his affairs and estate. R.S. 3:7-35, et seq.; In re McLaughlin,87 N.J. Eq. 138; 102 Atl. Rep. 439.
The single issue to be determined in this case seems to be whether the complainant on August 15th, 1941, lacked sufficient mental capacity to execute the trust indenture in question. Other issues raised by the bill of complaint, such as the charge of fraud and undue influence alleged to have been exerted by the defendant to procur the execution of the deed of trust, failed of proof. *Page 492 
After the death of Mr. Oswald, complainant became mentally very ill. The defendant, Seidler, brought her to his home where he cared for her, obtained doctors and nurses for her and endeavored to restore her to health and make her comfortable and happy. This was but normal for he regarded the complainant as his sister and she referred to him as her brother, all of which is understandable since the complainant was reared in the Seidler home by the defendant's mother from her childhood, and there existed a real bond of affection between complainant and the defendant. They were in fact cousins.
On May 19th, 1941, complainant made a last will and testament in which she gave all of her estate "unto my cousin, Frederic Arnault Seidler, absolutely," and she added in her will "I am making this disposition of my estate because of my said cousin's kindness, helpfulness and assistance to me during my lifetime." Kindness and similar acts do not constitute undue influence.Lowe v. Williamson, 2 N.J. Eq. 82; Den. Trumbull v. Gibbons,22 N.J. Law 117; In the matter of the will of John Gleespin,26 N.J. Eq. 523; In re Eatley's Will, 82 N.J. Eq. 591;89 Atl. Rep. 776; In re Mannion's Estate, 86 N.J. Eq. 232; 95 Atl. Rep. 988.
On July 15th, 1941, she executed a power of attorney empowering the defendant to sell her stocks and bonds and real estate and to generally manage and conduct her affairs.
On August 15th, 1941, the deed of trust, the subject-matter of the present suit was executed by complainant, which recites "her desire to be relieved of the management of her real and personal property," and by which instrument she transferred to the defendant all her property, real and personal, directing him as her trustee to invest in securities and real estate and to pay her from the income $75 per week during her lifetime, and so much of the principle of the trust "even to the full amount thereof, and at such time or times as he in his absolute discretion may deem advisable for her care, comfort and support or for any purpose, need or use connected with the said Louise G. Oswald. In exercising this discretion the Trustee shall consider only her interests without liability and the exercise of his discretion shall not be subject to review *Page 493 
or liability for any reason." Upon the death of Louise G. Oswald "the Trustee shall pay over the principal then in his hands to F. Arnault Seidler if he shall be then living, and if not as he shall direct by his Will."
"The rule is well settled that even though a person may be enfeebled by disease, or even irrational upon some subjects or subject to periodical mental aberrations or deficiencies, yet if he, at the time of his questioned transactions, was possessed of sufficient mentality to fully comprehend the nature and effect of the business then being transacted by him, his said acts will be valid and binding upon him. * * *"
This is the rule in the absence of fraud. Hayward v. PassaicNational Bank and Trust Co., 120 N.J. Eq. 512; 186 Atl. Rep. 728;affirmed, 123 N.J. Eq. 592; 199 Atl. Rep. 46; Wilkinson v.Sherman, 45 N.J. Eq. 413; 18 Atl. Rep. 228; affirmed, 47 N.J. Eq. 324; 21 Atl. Rep. 955; Leick v. Pozniak, 135 N.J. Eq. 67;37 Atl. Rep. 2d 302.
It appears that none of the witnesses for complainant had occasion to see or speak to Mrs. Oswald for sometime immediately prior to the execution of the trust indenture, and that none of them were present at the time it was executed, and therefore did not testify whether in their opinion she possessed sufficient ability at the time to understand in a reasonable manner the nature and effect of her act or of the business she was then transacting.
The testimony of the witnesses on the part of complainant was substantially as follows: Dr. Warren Reinhardt said that in March, 1941, complainant was "very much upset" and exhibited "grief to a great degree" over the death of her husband. She was very much bothered about her ability to manage her property. The defendant Seidler and the Oswalds were very cordial, and "Fred" Seidler was the "only relative that she [complainant] really had faith and confidence in;" that he had suggested Mr. Seidler as a person to "handle her estate;" that he did not see complainant from March, 1941, until August 23d 1941, several days after the trust indenture had been executed, and that there was nothing to indicate to him when he last saw complainant what her mental condition had been a week or two prior. *Page 494 
James J. Gibb, attorney for the Oswalds for some years prior to Karl Oswald's death, acted for Mrs. Oswald until May 13th, 1941. He did not see her after that date. In April or May of 1941, he did not think Louise Oswald was insane. He said, "I know she was queer, she was grieving over her husband's death, I thought she would come around all right after a course of time." In the intervening months it appears that he looked after and conducted the affairs of the estate for her and made trips with her to the safe deposit vault in the Fidelity Union Trust Company. He discussed affairs of the estate with her until May 11th. On May 13th, 1941, his services were discontinued, and he accepted $1,000 from her for his services. He apparently had no hesitancy to accept this money because of any question concerning her mental capacity. He forgot to turn over all the papers to her at that time and she reminded him of that fact.
Mrs. Gibb, the wife of the last witness, did not see Mrs. Oswald after April 14th, 1941. Before that time she says Mrs. Oswald was "nervous." "The woman seemed frustrated" over the death of her husband. After the funeral she was "just nervous and fussed. She ate her dinner like we did." Complainant was able to talk to Mr. Gibb about the estate, taxes and so forth and she knew all about her properties and assets; that Mr. Gibb felt that she would be all right; that Mr. Seidler was Louise Oswald's closest relative and was by complainant called "brother."
Mrs. Jean Gilman French, a practical nurse, attended Mrs. Oswald from the latter part of May, 1941, until some time in July, 1941. During this period Mrs. Oswald was sometimes "extremely nervous," and at other times "perfectly delightful and charming." They made trips to the bank together. Mrs. Oswald paid her by check and took receipts. Mr. Seidler was "solicitous of her [Mrs. Oswald's] welfare" and did all he could to make her comfortable. The witness did not see Mrs. Oswald but once after "sometime in July" and could not testify as to her mental capacity on August 15th, 1941. She says that Mrs. Oswald suffered from suicidal mania; that she tried to choke her and also tried to choke herself at night; tried to jump in front of trucks. Her testimony was *Page 495 
mostly based on conclusions rather than fact. For instance, she was asked: "Q. Did you have any talk with her [Mrs. Oswald], or did she talk to you about what would happen if she did choke you? A. Well, her idea was that if she could do away with me she could go to the chair and end her own life. * * * And a good many nights — I was on the third floor and she was on the second, and I was right over her, and a good many nights I think she used to try to choke herself, but of course she didn't tie her strings, and I used to find the strings in her bed and I tried taking them away, but I found it didn't make any difference, she always had another, but I presume as soon as she began to feel suffocated or out of breath she would let go, then I would hear her cough, and then I would know she was all right." She went on to say that when visitors came to the house "I don't think any one would ever have dreamt that she wasn't perfectly all right." (Italics mine.)
Officer John Polifka testified that Mrs. Oswald bought oxalic acid on August 20th, 1941. He did not see her on August 15th. On August 20th, the testimony of this witness indicates that Mrs. Oswald was clear of mind and competent in every respect. There is no proof of an attempt at suicide by Mrs. Oswald on that date or any other except April, 1941, immediately following the death of her husband.
Sergeant Ian Tosca testified to Mrs. Oswald's attempt at suicide by gas in April, 1941, and how on that occasion she was taken to the Orange Memorial Hospital.
John Neville of the Fidelity Union Trust Company saw Mrs. Oswald at the vault on April 12th, 1941. He had difficulty in convincing her that the vault could not be opened without her key. She came there with Mr. Gibb and they seemed to converse normally. According to the records of the bank, complainant was at the vault again on May 19th, 1941, and May 26th, 1941, but Mr. Neville did not see her after April 12th, 1941.
Ada Frances Wells, a social worker, who interviewed Mr. Seidler shortly after Mrs. Oswald was taken to Overbrook Hospital, says she obtained information from Mr. Seidler about Mrs. Oswald's history and several days later transcribed *Page 496 
it. The notes were not shown to Mr. Seidler to check their accuracy.
Dr. Leon Ginsberg, a member of the staff of the Overbrook Hospital, and familiar with her (Mrs. Oswald's) history while at the hospital, says he did not see Mrs. Oswald prior to August 23d 1941, and had no actual knowledge of her condition on August 15th, 1941, or prior to August 23d 1941. He says "the motivating cause of my calling her insane" was her suicidal complex. He said that Mrs. Oswald's intellectual faculties were well preserved and that any insanity manifested by her was related only to the existence of a suicidal complex. When Mrs. Oswald was discharged as "recovered" from Overbrook Hospital in 1943 it was by the unanimous vote of the hospital staff with the exception of Dr. Ginsberg who voted against her discharge.
Dr. Christopher C. Beling saw Mrs. Oswald for the first and only time on July 18th, 1943. He examined her shortly before the hearing. He was asked, "Doctor, do you consider her competent at this time to testify as to events which occurred between March 28th, 1941, and August 23d 1941? The court: That is, mentally competent? Mr. Murray: Mentally competent. A. Oh, well, that is different. As to what the facts would be is a different matter, but, mentally, why, she was in possession of her mental faculties. She could testify. Q. Could you give us any opinion as to whether her testimony concerning events during that period would be reliable? A. I feel that my — do you want me to answer that question? I feel from my own observations of her, see? and conversations with her that she rationalizes a great deal. Q.
Meaning what? A. Because she now feels she wants her possessions, and she rationalizes all her conduct of the past in the light of it. Q. In accordance with the actual facts or contrary? A. That is all. She rationalizes in relation to the fact that she wants to prove something, which I am not going to say what it is."
I think the letter written by complainant to one of the Vice-Chancellors of this court explains what the doctor had reference to when he said "she wants to prove something, which I am not going to say what it is." The letter reads: *Page 497 
"In reference to Mrs. Gibb's petition [referring to In reOswald, 132 N.J. Eq. 325; 28 Atl. Rep. 2d 299], regarding me — would say that I would beg you to appoint a guardian for me in place of the `trustee.' I signed trustee papers making Mr. F.A. Seidler my trustee with the understanding I was to be placed in a `home' — Instead I was brought up here. Unfortunately — having no desire to live — since my husband's death I cannot get over the `suicide' complex — Am so helpless — that I feel I want some one to take care of my financial affairs. I regard the `trustee' affair not right since it did not effect the purpose for which it was signed. However, in my helplessness — I request the Court appoint a guardian — to take charge — preferably Mr. Seidler if he will serve in that capacity." "P.S. As it stands now — the `Trustee' contract is too one sided, and too unfair to me to be of value — and I certainly wish it discarded and a guardian appointed." This letter is dated May 31st, 1942, and is written from Overbrook Hospital.
Dr. Florence Obuchowski, a member of the staff of Overbrook Hospital and who had charge of Mrs. Oswald during all the time she was there, testified that she did not see Mrs. Oswald prior to August 23d 1941, and was not able to tell of her mental condition on August 15th, 1941. She says "I saw her on the 23d and intellectually she was unimpaired, and throughout her residence of two years, in which I had daily contact with her, there was no decided change in her intellect."
The witness says there were times at the hospital "when she was disturbed and agitated and pacing the floor," but "was aware of everything that was going on about her." Q. "And what do you mean by being aware of everything that was going on about her? A. Well, she was not confused. She was in contact with environment and everything." And here it should be noted that the hospital records show that her case was diagnosed as "suicidal complex."
The complainant testified that although her maiden name was Louise Griffin she was known as Louise Seidler and taught school in the City of Newark under the name of Seidler. Having been reared in the Seidler home, she called *Page 498 
her aunt and uncle "mama" and "papa." She quite clearly recalled all of the events which preceded the execution of the trust indenture. She described what her estate consisted of, enumerating in detail the real estate and the mortgages. She recalled and enumerated the conferences with Mr. Gibb, and afterwards with Judge Forlenza in connection with her husband's estate in preparation of the state and federal inheritance tax returns; how she later attempted suicide on April 15th, 1941, and was taken to the Orange Memorial Hospital; how she was afterwards taken to the home of the defendant Seidler where she was attended by a day and night nurse procured by Mr. Seidler. Her testimony concerning the actual signing of the trust indenture was that on a Wednesday or Friday night Judge Forlenza and the defendant Seidler called on her and said "We have your trustee papers and you are going to sign them. And, oh, they were real smooth, nice and purring. And I was so sick. I didn't know what I was doing. I said `I don't think I ought to sign these papers.' Well, then Mr. Seidler started to yell at me the way he usually did, scream at me, and Judge Forlenza sat there, and I said `Mr. Forlenza, would you allow your sisters to sign a paper like this?' He said, `Why, Mrs. Oswald, I surely would,' and he said, `I have got to get my train, I have got to get my train. Oh, you got to hurry up and sign it. * * *' And I said `I — I — I don't want to sign those papers, I don't think I am doing right,' and I started wringing my hands, and I didn't know what to do, and Mr. Seidler walked out of the room and then he came back and he kept saying, `Oh, you don't know what you want' * * *. `You have nothing to lose, I will take care of your money and all.' Well, finally, I signed the paper."
Referring to the trust indenture being discussed with her before it was signed, she said, "I have no recollection of having discussed it with Mr. Forlenza." Later, she was asked "When Judge Forlenza came and asked you for these deeds, he must have told you something, didn't he, of why he wanted them? Well, that is all so hazy, Mr. Murray. He said, `We have to have these deeds if this trusteeship is to be brought.' But I didn't know why they had to have them." The court: *Page 499 
"Then you knew at that time that there was such a proceeding to be brought? Yes, sir. I had consented, if they took me in a home, that there was to be a trusteeship to take care of my estate for me." She says that before Judge Forlenza called for the deeds in order to prepare the trust indenture she had talked the matter over with Mr. Seidler. The witness was very alert while giving her testimony and impressed me as a woman of more than ordinary intelligence.
The trust indenture was prepared by Judge Felix Forlenza a reputable member of the bar, who represented Mrs. Oswald from and after May 13th, 1941. The judge lived across the street from the Seidlers. It appears he only knew Mr. Seidler from seeing him going in and out of his home. About the time complainant attempted suicide, Seidler called on the judge to see what could be done to prevent publicity. The witness knew Karl Oswald for many years long before he was married to complainant but did not know Mrs. Oswald. He saw Mrs. Oswald at the hospital and told her there would be no publicity concerning her attempted suicide. She told the judge that Mr. Gibb was her lawyer but that she wanted to make a change and gave him her reasons for so doing. He was at the hospital just once. The next time he saw Mrs. Oswald was in May, 1941, when she sent for him; she was then in the home of Mr. Seidler. On this occasion she discussed with him further the fact that she was dissatisfied with Mr. Gibb and he told her he could not entertain doing her business unless she settled with Mr. Gibb for whatever was due him, which settlement she did make, paying Mr. Gibb $1,000 and Mr. Gibb turned over to him some of her papers and he gave them to the complainant. She checked them and said they were not all the books and papers.
The judge prepared the state and federal inheritance tax returns, the necessary information being given to him by Mrs. Oswald. When preparing the estate tax returns, complainant discussed with him at length the question as to whether the property in the joint names of herself and her husband would be assessed. The tax was considerable. She was short of cash and the judge suggested that she have one of the banks take over one or two of the mortgages. Instead, *Page 500 
she sold some of her "Hecker Products" to make up the difference. On several occasions he went to the bank with Mrs. Oswald in connection with estate matters. She said it was too much of a task for her to collect rents and to manage her real estate and wanted the witness to do this for her, which he did. She took receipts from him and gave him receipts when he rendered statements of account. He says she understood everything perfectly; that she is "a very intelligent person. She is a very inquiring person;" that she often expressed concern over her financial status and viewed her estate as "a gigantic thing for her to handle." "She said she depended on Karl so much, who had handled all these matters for her, and that she felt it was too much for her to handle." "Q. You knew that she attempted suicide? A. Yes, I did. Q. You say that despite the fact that she had once attempted suicide she was intelligent and rational in her dealings with you, when you dealt with her? A. No question about it. She was normal, Mr. Kaufman. Q. Did you yourself ever see her emotionally upset, except the time you were in the hospital, when you were with her? A. No, I never did."
Concerning the execution of the will hereinabove referred to, the witness says, while he was handling the administration of the estate, Mrs. Oswald asked him whether the Sterns would come in to inherit Karl's estate. The Sterns are relatives of her husband; that he told her he was not so sure about that, and that the way to obviate this was for her to make a will to whomever she desired to give her estate, to which complainant replied, "there is nobody but Fred [the defendant] that I want to have what belongs to me or Karl;" that she directed him to draw her will leaving everything to Fred Seidler and naming him as executor. After he drew the will he left it with complainant for several days after which she told him she would sign it. He said he had never spoken to Mr. Seidler about this will and that he kept it in his possession until it was brought by him to court and offered as an exhibit.
Later, the complainant told the judge that she was all alone and couldn't handle the estate matters. She said, "I *Page 501 
want somebody to handle it for me. I want to be sure of a definite income." He told her she should appoint a bank and suggested her bank, the Fidelity Union Trust Company or the South Orange Trust Company. He says he talked the matter of the banks over with her with the idea of having one of them appointed as trustee but that she wanted the defendant saying, "He is the only one that has done anything for me." "After all," she said, "he was going to get all of the estate, and why shouldn't he work for it? That was her belief in the matter, let him earn some of it." And she said, "Is there any way that we can do this so that he can get it at the end, but not before then, not until my death?" He told her that that could be done. He says the trust indenture was her idea entirely and that he made no suggestion and that he did not discuss the matter with Mr. Seidler before the trust indenture was drawn. He made two drafts. The first one was a rough draft which he gave to complainant and after it had been in her possession for several days he obtained the draft from her and then had her execute the same, but that he had gone over the first draft with Mrs. Oswald before that time and a few minor changes were made; that the rough draft was delivered to her the latter part of July and the final draft in the early part of August; that he went to see her on the 13th of August, 1941, and that the instrument was signed by her on the 14th, and after she signed it "she kept it there." On the evening of the 15th the defendant Seidler was present. Before he signed the indenture Seidler said to the complainant, "I have told you repeatedly that I am busy, I am not around a great deal, I cannot handle this thing for you," and suggested that she appoint some bank; that the complainant answered, "No, I don't want a bank, I want you. You are the only one I have and therefore there is no question why you should not do it for me. You are going to get everything, anyway." Seidler said to complainant, "You know I go away for extended periods and I can't handle this thing for you," but the complainant pleaded with Seidler and almost came to tears, and that it was then that Seidler said, "If it makes you feel better, Louise, I will do it, but only on one condition, *Page 502 
and that is that Judge Forlenza handles this matter, continues to do what he is doing now, because I cannot attend to the details." Judge Forlenza says that the complainant comprehended the amount of her property, the nature of her acts and the object of her bounty. "She was at all times normal and competent when I was with her. There is no question about that." Speaking of the trust indenture, he says that he "went over the whole thing with her. We read it over together when it was drawn."
The attention of the witness was called to the testimony of Mrs. Oswald in which she said that on the day the trust indenture was signed, Mr. Seidler said, "I will be your trustee and you will draw these trustee papers and that is the only way you can go in a home." That she was distraught and harassed and willing to do anything to get out of the house. That the judge came in and said she had to give him the deeds and he brought the trustee papers to her; that she had to do what he told her. None of which the witness said occurred but that on the contrary complainant was very friendly with him and that as late as May 8th, 1942, wrote a letter to him while she was at Overbrook which reads: "Dear Judge Forlenza: In answer to Mrs. Gibb's petition to the Court of Chancery to have me pronounced incompetent to manage my own affairs and that a guardian be appointed to replace Mr. F.A. Seidler, my cousin known as my brother, as trustee of my affairs I wish to state that I most fervently desire that the Court appoint Mr. F.A. Seidler, my cousin, known as my brother, as guardian to be answerable to the court to act in my behalf. I fully trust him and I also wish you to continue as my counsellor. Thanking you, I am, yours truly, Louise G. Oswald. Dated May 8th, 1942."
The defendant Seidler is a man of wealth and position. He graduated from Dartmouth with the degree of Bachelor of Science in 1913. He is engaged in the export business in New York, and also in the engineering business in New Jersey, and is possessed of much wealth in his own right. He described in detail his relationship with complainant and how they regarded each other as brother and sister and how he cared for her after the death of her husband. He told of *Page 503 
complainant's grief and the mental stress under which she labored for sometime after the death of her husband, which he said was "induced by the horrible death of Karl. He choked to death, that is how he died, in her arms." "There were periods when she was somewhat agitated, but lots of times she was quite calm." That he did not know Judge Forlenza except to greet him on the street. He first approached the judge after complainant attempted suicide, hoping to interest him in keeping the matter out of the public press, and later the judge went to the Orange Memorial Hospital to comfort complainant and tell her what he had done with respect to avoiding publicity. That he did not know of the will which Mrs. Oswald had made in his favor; that Judge Forlenza told him about it when these proceedings were commenced and that he for the first time saw the document when it was exhibited in court; that Judge Forlenza had it in his possession in his office all the time. Complainant asked him many times to take over her affairs after the death of her husband and that he wanted her to appoint a bank; that he was not present when complainant executed the trust agreement; that complainant called him from upstairs to come down and sign it, when he again told her he did not want to undertake the matter but upon her pleading with him to do so he consented saying, "if this helps you, all right, I will sign it," but insisted that Judge Forlenza must look after the details, to which she agreed. He says complainant thoroughly understood what she was doing and was competent in every way.
I deem it unnecessary to further recite the testimony for the complainant and for the defendant, since I am satisfied that complainant knew and understood what she was doing when she executed the trust indenture and was thoroughly competent at the time. The burden of proving mental incapacity was upon complainant and that burden was not sustained by the credible evidence. In re Shimer's Will, 103 Atl. Rep. 383; In re Bottier,106 N.J. Eq. 226; 150 Atl. Rep. 786; In re Craft's Estate,85 N.J. Eq. 125; 94 Atl. Rep. 606; In re Strang, 109 N.J. Eq. 523;158 Atl. Rep. 489; In re McComb, 118 N.J. Eq. 119;177 Atl. Rep. 849. *Page 504 
Prior or subsequent incapacity is immaterial. Capacity at the time of the execution is the only valid test. O'Brien v.Dwyer, 45 N.J. Eq. 689; 17 Atl. Rep. 777; In re Delaney,131 N.J. Eq. 454; 25 Atl. Rep. 2d 901.
Proof of an attempted suicide is insufficient to make out a case of insanity. Proof of mere attempts to commit suicide without more, exhibit, at most, but a temporary mental affliction, having no reference to antecedent or subsequent periods of time. Koegel v. Egner, 54 N.J. Eq. 623;35 Atl. Rep. 394. Even an adjudication under a writ de lunaticoinquirendo (not present in this case) is merely prima facie
proof of disqualification and subject to rebuttal. Den ex dem.Aber v. Clark, 10 N.J. Law 217; Hunt v. Hunt, 13 N.J. Eq. 161; In re Coleman's Will, 88 N.J. Eq. 284; 103 Atl. Rep. 521;affirmed, 88 N.J. Eq. 578; 103 Atl. Rep. 78; Eckman v. Wood,108 N.J. Law 105; 154 Atl. Rep. 862.
I will advise decree in accordance with the conclusions herein expressed. *Page 505