In the matter of the application for probate of the alleged last will and testament of SPENCER W. BUCKMAN, deceased.

[Decided November 18th, 1912.]

This is an appeal from a decree of the prerogative court, affirming a decree of the Mercer county orphans court admitting to probate the last will and testament of Spencer W. Buckman, deceased. The reasons which led the orphans court to admit the will to probate are set forth in the following opinion of the judge of that court:

GNICHTEL, J.

"This is an application to have admitted to probate a paper dated January 22d, 1909, alleged to have been executed by Spencer W. Buckman, then and at the time of his death residing in Trenton, New Jersey, as his last will and testament.

"The application is made by Wallace Buckman and Mary Parsons, two of the executors named in the alleged will, and to the application a caveat has been filed by Owen Moon, Jr., and Caroline and Albert B. Wharton, grandchildren of the deceased.

"The paper was executed in conformity with the statutory requirements. The grounds urged against the validity of the instrument are—*first,* want of testamentary capacity in the testator, and *second,* that its execution was unduly influenced by the proponents, who are, by its terms, beneficiaries to the extent of two-thirds of the estate. At the time of the execution of the alleged will, and at the date of his death, Mr. Buckman had three children living, namely, Mary B. Parsons, Wallace Buckman and Charles Buckman. Sarah B. Wharton, a daughter, died many years ago, leaving two children, Albert B. Wharton and Caroline Wharton. Mrs. Elizabeth Moon, another daughter, died a few days before the execution of the will, leaving one son, Owen Moon, Jr.

"The caveators, to establish their claim of mental incapacity, have produced testimony to show that until three or five years

ago the testator was a man of vigorous mentality; that he then began to fail, and that he steadily declined until the change became marked, both mentally and physically, in the spring of 1908; that he was hard of hearing; his eyesight was quite defective; he was careless about his dress; was untidy; his memory was poor and at times he was unable to control the functions of nature; he remained in his room most of the time, and when he took a short walk the coachman usually accompanied him; he would spend considerable time in counting and recounting his pocket money and his fingers; would move his lips and utter no sounds; would sit by handling bits of cord, and slept considerably during the daytime; at times he was childish; he failed to comprehend that the food he was eating was the same he was then asking for; to make him understand a remark it had to be repeated two or three times; in 1908 he didn't know that Christmas was a holiday; wore his overcoat in the house for the purpose of getting wear out of it; went to bed in the middle of the day under the belief that he had had his supper; at times talked irrationally and forgot where some of his children lived; could not distinguish between checks and notes; on one occasion failed to recognize his son Wallace; was incoherent at times in his speech; had difficulty in fixing his mind on a subject; during the fall of 1908 there were occasions when it took considerable effort to attract his attention; he was dull and there was an apparent lack of comprehension. Basing their opinions on such facts as these, a number of the witnesses testified that the testator did not understand the business he was transacting when he signed the will on January 22d, 1909. The majority of these instances can readily be accounted for by the fact that age had undoubtedly impaired the testator's hearing, sight and memory, and it is undoubtedly true that this apparent mental decline was not at all constant. During this same period, witnesses, with equal opportunity to observe the testator and converse with him, found entirely different conditions. They testified in substance that he was a remarkably bright man for his age; that to an extent he kept in touch with current events; that he remembered people and events both prior to and subsequent to January 22d, 1909; that on April 7th, 1908, he executed a power of attorney

to Owen Moon, Sr., which has never been questioned. On October 29th, of the same year, he executed and acknowledged another power of attorney to Owen Moon, Sr. Mr. Stephen Cook, who took the acknowledgment, found Mr. Buckman in good condition; they conversed about his health, and Mr. Buckman stated that it was because of his defective eyesight that he was confined to his room. Apparently, Mr. Cook and Mr. Moon were both satisfied that Mr. Buckman, at that time, fully comprehended the business he was transacting. On Christmas day, when one of the witnesses declared he did not comprehend that it was a holi- ·day, the testator conversed sensibly and intelligently with a number of people. On January 22d, he asked Mr. Moon to prepare a list of his mortgages; he spoke to a number of people about the fire on the Comfort farm and about some horse thieves. In the forepart of April, 1909, about two weeks before his death, he had an extended conversation with his grandson, who had as- ·sisted in the capture of the thieves. He inquired after all the details—the place where they were captured, their trial and :sentence, and particularly the reward his grandson received for his share in capturing the thieves. The matter seemed to be of great interest, and he expressed regret that the thieves didn't get a longer sentence. They conversed about jury duty; that he had been a juror a number of times, and that it was good education for a farmer's son; he spoke about the Comfort fire and he asked ·about the insurance, the stock that had been consumed and ·damaged, and discussed other topics gleaned from the county paper.

"It would seem from the testimony that Mr. Buckman's condition varied; that it was affected by his surroundings and circumstances; that at certain periods he ,was dull and somewhat ·slow of comprehension, and at others his faculties were brighter and more alert. Mr. Moon, Sr., who looked after his investments, states that 'there were times when he seemed to be a little ·dull right at the start, but he would directly understand the conversation.' Some of the witnesses were impressed with his ·capacity to transact business, while others received a different impression. This is illustrated by the testimony of Vice-Chancellor Walker and Mr. Linton Satterthwait, who had interviews with

the testator at different times in December, 1904, about a claim against a real estate agent in Trenton. Vice-Chancellor Walker testified that when he met Mr. Buckman 'he seemed very much agitated, his hands trembled and he drooled at the mouth;' that his conversation was 'disjointed, disconnected and rather incoherent,' though out of it all there could be evolved an idea of what was wanted. That the testator's condition was such that he did not understand or could not intelligently and understandingly transact business, and he found it necessary to turn to Mr. Moon to get a detailed explanation.

"Mr. Satterthwait's experience was entirely different. He had known the testator since 1895, and states that in the interviews concerning the matter referred to by Vice-Chancellor Walker, and at about the same time, there was nothing noticeable about the testator that would distinguish him from any other old person, that he was a remarkably bright man for a man of ninety, and his conversation was not essentially different from anyone going over the details of a claim; that his statements were intelligent and coherent, and nothing transpired that was at all out of the ordinary; that he had a peculiar manner of speech, always spoke in a high key, and had a little mannerism of working his lips as seeming to expel something—a spitting motion without actually spitting.

"These witnesses had been in the active practice of law for many years and had had extended experience with men and affairs, and the result of their observation of the testator are radically different. This is also true of other witnesses. In view of this conflicting and contradictory testimony, the occurrences at the time of and immediately surrounding the execution of the will become extremely important. The point of time at which the testamentary competency is to be tested is that of the execution of the will. The antecedent and subsequent condition of a .testator is chiefly important as bearing upon that epoch. *O'Brien v. Dwyer. 45 N. J. Eq. (18 Stew.) 689.*

"The will was executed on January 22d, 1909. On January 22d, Mr. Frank S. Katzenbach, Jr., a lawyer of large practice and experience, was sent for. After describing what occurred upon reaching the house, he says he was ushered into a bedroom and

found 'a very elderly man,' and after some conversation, the old gentleman said he was an old man, ninety-four years old; that he had lived to see all his children, except three, buried; and on that day a daughter, Mrs. Moon, was buried; that about twenty years ago he had made a will in which he had left all his property to his four children, except that he remembered his grandchildren in the will * * * he wanted now to change his will. Upon being informed that Mrs. Moon's share would go to her son, he said he knew that, and that was what he did not want; that the young man had more money now than he could properly take care of and he would now get more; that his grandchildren had more money than his children, and he wanted his property divided among his two sons, Wallace and Charles, and his daughter, Mary Parsons.

"In response to questions, he informed Mr. Katzenbach that his property consisted 'mostly of money and mortgages.' He told him the amount he had in cash and where it was deposited, and when asked how much he had in mortgages he replied that it was not necessary for the lawyer to know that in order to draw his will, and Mr. Katzenbach then stopped asking questions.

"He said he wanted as executors his son Wallace, Owen Moon, Sr., and his daughter, Mary Parsons. Mr. Katzenbach called his attention to the fact that he was ignoring his grandson, Owen Moon, Jr., and asked why he wanted the father as executor; his reply was that he was one of the executors of the other will, that Owen had asked him, and if he didn't make him an executor 'he would kick up his heels and make a fuss.' He also said that Owen Moon, Sr., had been attending to his business. He then asked Mr. Katzenbach to call his son Wallace Buckman, and when he appeared, he directed him to deliver to Mr. Katzenbach the old will. He said he wanted the will like his old one, except he wanted his property divided equally among his three children. Mr. Katzenbach called the next day for the purpose of having the will signed. When he read the clause containing the bequests to the grandchildren the old gentleman stopped him, said that it was wrong, that he didn't want to leave anything to his grandchildren. The balance of the will was read and the testator said

it was satisfactory except that he didn't want to leave anything to his grandchildren.

"The will was redrawn and about an hour afterwards Mr. Katzenbach was again at the house, and before the will was produced the testator conversed with Mr. Katzenbach and referred to a case he had had against him which cost him [the testator] about $1,000. The will was again read to him and Mr. Katzenbach testified that

" 'after this will had been read to Mr. Buckman by myself, I told him that it would be necessary for him to execute the same in the presence of two witnesses, who must be present at the same time and subscribe their names in the presence of the testator and see him sign his name. Mr. Buckman then said he would have to have his hand held, as it was unsteady. Pen and ink were then called for, and Mr. Buckman, who was sitting in the chair by the desk, raised partially and his chair was moved over to the desk; a pen was placed in his hand and he asked me to start him a good ways over on the paper, which I did. He then wrote the letter "S," pronouncing the letter "S," then "p," pronouncing the letter "p," then "e," pronouncing the letter "e," and so on with each one of the letters in his signature. After that signature had been completed, I then asked Mr. Buckman if he signed, sealed and published and declared that to be his last will and testament, in the presence of Mr. Geraghty and myself, and asked Mr. Geraghty and myself, in his presence, and in the presence of each other, to subscribe our names thereto, as witnesses. He said, "I do." Thereupon Mr. Geraghty signed his name, and after he had completed his signature I took the pen and signed my name, and he told me to keep it, and I said, "Good afternoon," and Mr. Geraghty and I walked out.'

"This testimony, which is corroborated by Mr. Geraghty, standing by itself would seem to establish quite satisfactorily the testator's competency at the time of the execution. There was nothing in what he said at any of these interviews which indicated any failure of mind, memory or understanding, and what he said was sensible and appropriate to the occasion. His manner was direct and positive. That he heard and understood the will as it was read to him is apparent from the fact that he instantly detected an error which had been made in the draft. Evidence of previous weakness and inability, if credited, is admissible and important. But if evidence of capacity during the period while the business was in hand is convincing and sufficient, the evi-

dence of previous incapacity has no weight. *Armstrong* v. *Armstrong, 69 N. J. Eq. (3 Robb.) 817, 820.*

"The paper under consideration divides his property among his living children, and, so far as the disposition of his estate is concerned, is practically in harmony with the will made by the testator in 1892, except in that will he left small legacies of two children of a deceased daughter. In the will of 1909 he omitted all reference to his grandchildren. There was some reason for this. The children and grandchildren were all beneficiaries under the will of Isaiah Williamson, of Philadelphia; the generation to which the grandchildren belonged had received about $175,000 each, while the generation to which the children of Spencer W. Buckman belonged had each received a life interest in $60,000, which, at death, was to be divided among their children. Isaiah Williamson died in 1888 or 1889; the first will of Spencer W. Buckman was made on June 2d, 1892, the second one January 22d, 1909, and both papers seem to have been made with a view of dividing his estate among his children and ignoring his grandchildren. In view of the disposition made of the Williamson estate this was perfectly natural; the testator in both instruments showed a preference for his children, who were nearer to him, and had received considerable less money from the Williamson estate.

"The fact that the will is in itself natural and reasonable is a fact corroborative of the correctness of the opinions of the subscribing witnesses that the testator possessed testamentary capacity at the time of the execution of the will. *Clifton* v. *Clifton, 47 N. J. Eq. (2 Dick.) 227.*

"The other contention raised by the caveators is that the alleged will was the result of undue influence exerted upon the testator by the proponents, Mary Parsons and Wallace Buckman. From 1900 down to June, 1908, the testator resided with his daughter, Mrs. Moon, at which time, because of the daughter's health, the family went to the seashore, and the testator was brought to Mrs. Parson's house. He returned to Mrs. Moon's house in October, and remained there until December 30th, when, on account of the serious illness of Mrs. Moon, he was again brought to Mrs. Parson's house, and continued to live there until

he died, April 25th, 1909. The change on both occasions was made at the suggestion of the Moons. There is no evidence that he contemplated making any change in his will during the lifetime of Mrs. Moon. The first intimation of such intention was given by the testator himself, who, shortly after Mrs. Moon's death, said to Mrs. Parsons, 'I am sorry Lib's gone, and I will have to make some change in my affairs,' and he added, 'I would like you to get a lawyer.'

"On the day of Mrs. Moon's funeral, January 21st, 1909, Mrs. Parsons consulted with Mr. and Mrs. Tyson, her daughter and son-in-law, concerning the request of her father, and Mr. Tyson suggested Mr. F. S. Katzenbach, who accordingly was sent for. Counsel for the caveators admit that there is absolutely no direct testimony in the case to show any undue influence, but claim that the circumstances surrounding the execution of the will, in connection with the testator's mental condition, proved that the will was not the product of the free will of the testator. I have carefully considered the testimony and cannot agree with this view. I am satisfied that the testator had sufficient testamentary capacity to make a will, and there is nothing in the testimony which would tend to show that he had not the freest opportunity to make up his mind as to the disposition of his property. His general purpose, according to his own statements to Mr. Katzenbach, was to divide his property equally among his living children. This was not a newly-conceived purpose, nor does the testimony show that it was prompted by the suggestions or influence of others. The same purpose is shown by the will of 1892. Evidently, he had this purpose in mind through all these years, and when by the death of Mrs. Moon the conditions were changed, he realized that if he desired to adhere to the testamentary disposition made by the will of 1892, a change would be necessary, and he said to Mrs. Parsons, 'I am sorry Lib's gone and I will have to make some change in my affairs. * * * I would like you to get a lawyer.' Stress is laid upon the fact that at this time he turned to Mrs. Parsons for aid and asked her to get a lawyer. There was nothing unnatural about this. She was his only living daughter. He was living at her house, and he had a perfect right, as incident to the right of testamentary dis-

position, when he desired to put his testamentary wishes in legal form, to the aid of any person he thought proper to select.

"The influence which is said by law to be undue, and therefore to vitiate a will, must amount to moral or physical coercion which destroys free agency and constrains its subject to do that, which, but for it, he would not have done. The testimony does not show any such influence. His manner in giving directions for the drafting of his will, and the occurrences at and immediately surrounding its execution, would indicate that the testator was able to, and did, exercise his judgment and will freely, without any undue influence, and after a careful examination of the whole case, my conclusion is that the paper offered is the last will and testament of Spencer W. Buckman, and should be admitted to probate."

*Mr. Malcolm G. Buchanan* and *Mr. John H. Backes,* for the appellant.

*Mr. Edward L. Katzenbach* and *Mr. Frank S. Katzenbach, Jr.,* for the respondents.

PER CURIAM.

The decree of the prerogative court will be affirmed, for the reasons stated in the foregoing opinion delivered in the orphans court.

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, BERGEN, VOORHEES, MINTURN, KALISCH, BOGERT, VREDENBURGH, CONGDON, WHITE, TREACY—13.

*For reversal*—None.