In the matter of the estate of Fredericka C. McKinney, deceased.

[Argued March 14th, 1916. Decided June 19th, 1916.]

1. In a will contest, the burden of establishing that testatrix, when the will was executed, was unconscious, and hence incapable of making a will, was on the contestant.

2. In a will contest, evidence *Held* sufficient to establish testatrix's testamentary capacity at the time the will was executed.

3. In a will contest, evidence *Held* not to show that the will was the result of undue influence exerted upon the testatrix.

On appeal from a decree of the prerogative court advised by Vice-Ordinary Howell.

*Mr. Ralph E. Lum,* for the appellants.

*Mr. Robert H. McCarter* and *Mr. Arthur F. Egner,* for the respondent.

The opinion of the court was delivered by

KALISCH, J.

The controversy in this case concerned the execution of a paper-writing purporting to be the last will and testament of Fredericka C. McKinney, deceased.

The respondent filed a *caveat* against the probate of the will. His attack upon it was, firstly, that the testatrix, at the time of its alleged execution, lacked testamentary capacity to make a will; secondly, that the will was the result of undue influence exercised by the beneficiaries named therein.

The Essex county orphans court decided that the testatrix lacked testamentary capacity and decreed that probate of the will be refused. From that decree the appellants appealed to the prerogative court, and that court affirmed the decree of the orphans court upon the like ground.

The case is before us for review on an appeal by the appellants from the decree of the prerogative court.

The two principal questions presented for decision by this appeal are whether the testimony before the court below and now under review will reasonably support a finding that the testatrix lacked testamentary capacity when she executed the will, and if the testimony fails in that respect, whether it will reasonably support a finding to the effect that the beneficiaries named in the will exercised undue influence upon the testatrix?

An examination of the testimony in the case shows that the testatrix was seventy-nine years of age, and that she made the will in dispute in her last illness and about twenty-four hours before she died. The only property that she owned was a piece of improved real estate, estimated to be worth from $15,000 to

$20,000, which she originally acquired by her husband's will for "the term of her natural life or widowhood." The testatrix remained a widow. The property was subject to a mortgage. By the terms of the will the testatrix was obliged to keep up the premises, and to have the appellant "carefully instructed and educated at the expense of the estate" until he shall have attained the age of sixteen years. It appears that the appellant McKinney was an orphan and no relation to either the testatrix or her husband, but was taken by them, treated and reared as a member of the family from the time that he was an infant. At the time of the death of the husband of the testatrix the appellant McKinney was between eleven and twelve years of age. The case shows that the testatrix was obliged to expend considerable sums of money in carrying out the behests of her husband's will and in supporting the father of the respondent, who occupied a portion of the demised premises free of rent, and another member of the family, which caused the interest on the mortgage and taxes to fall in arrear; the mortgage was foreclosed and the property sold, and the testatrix bought in the same, in July, 1888, negotiating a new mortgage to cover the arrears. Charles F. McKinney, the grandson and respondent in this case, was the only descendant lineally. In 1909, the testatrix made her will, and after making bequests to various friends of specific sums of money and a bequest to the appellant McKinney, who she designated as her godchild, she bequeathed and devised the rest of her personal and real estate to the respondent and made him one of her executors. Some time subsequent to the making of the will the testatrix consulted with John Monteith, her lawyer, who drew the will, as to her legal rights to sell the real estate. It appears that this inquiry was prompted by statements made to the testatrix by her grandson, to the effect that she had only a life interest in the property, and therefore no legal right to dispose of the fee, and that if she attempted to make any disposition of the same, he would start legal proceedings to restrain her. In the month of January, 1914, the respondent filed his bill of complaint, in the court of chancery, against his grandmother, attacking her title to the property and claiming the same in his own right, as remainder-

man, and asking that she be made to account for the income received by her from the property and that she be made to pay and cancel a mortgage of $1,000 which existed on the property. The testatrix was in poor financial circumstances. Her income from the property when fully rented was about $71´ a month. The suit against her proved a source of great anguish and a burden to her because of the undutiful conduct of her grandson, and because she was compelled to go to the expense of $100 in employing Mr. Monteith to defend her, which sum she could illy afford to pay, but which she did manage to pay, in two installments.

Bearing in mind the foregoing facts, it is not to be wondered at that the testatrix deemed the respondent to be unworthy as an object of her bounty. Indeed, it would have been a solecism in human conduct if the testatrix, in view of the anguish her grandson had deliberately added to the infirmities of her age, had noticed him in the will, made in her last illness.

While it is true that the respondent had agreed with Mr. Monteith to discontinue the suit against his grandmother, before she made the will in dispute, it could hardly be expected that the sting of the respondent's ungrateful behavior which put his grandmother to expense and financial strait, of which she bitterly complained, and the exhibition of the respondent's selfish conduct throughout, had been effaced from her thoughts when she was called upon, by the lawyer who drew the will, to mention those who were to benefit by its provisions.

We now approach the consideration of the first contention, of counsel for respondent, that the testatrix, at the time the will in dispute was executed, lacked testamentary capacity. The specific charge made is, that at the time when it is alleged that the will in controversy was executed by the testatrix, she was unconscious, and hence incapable of making a will. The burden of establishing this proposition was on the contestant. The facts surrounding the making of the will are briefly these: On Friday, June 19th, 1914, the testatrix was taken seriously ill. Dr. Phelan, the family physician, found her suffering from edema of the lungs and part of the throat which, as he testified, caused difficulty in swallowing and air hunger. She had diffi-

culty in breathing and speaking. On the following day, Saturday, he found her a "little improved." On the next day, Sunday morning, he found that the edema had not progressed much and thought that she was a little bit improved. On the succeeding Monday, the 22d day of June, the doctor visited his patient three times. His first visit was made at ten o'clock in the morning, and he testified that he found her a great deal worse than on Sunday; there was an extension of the edema. The doctor, on his direct examination, was asked: "*Q.* Did you have any difficulty, on your Monday morning visit, in getting her attention?" he answered, "Why her eyes seemed active, but there was no conversation." When asked whether he could get her attention, he said he could but could not get her to speak. The doctor visited his patient the second time on that day about ten minutes after four o'clock and remained with her about twenty minutes. He testified that he found the edema spreading and the condition of the patient worse; that the intelligence of a patient in that condition is all right, but the difficulty in breathing occupies the patient's mind to such an extent as to prevent giving attention to anything else. On his cross-examination the doctor testified:

"*Q.* And on Monday morning you found the condition a little worse than it had been on Sunday night?

"*A.* Yes, sir.

"*Q.* But she was still entirely conscious?

"*A.* Her eyes were bright.

"*Q.* Her eyes were bright and alert?

"*A.* Yes, sir.

"*Q.* Active; her eyes were active?

"*A.* Yes, sir.

"*Q.* Indicating definitely the presence of intelligence to you?

"*A.* Yes, sir."

On further cross-examination the doctor, speaking of his patient's condition at four o'clock on that afternoon, says that he had no distinct recollection of her physical appearance at that time, except the difficulty in breathing and the "non-response on being spoken loudly to;" that he could not swear that she was unconscious. The doctor did not see his patient again until ten o'clock on Monday night, and then it was for the first time, according to his testimony, that he found her unconscious.

There is no indication in the doctor's testimony that the testatrix was unconscious any particular length of time before ten o'clock on Monday night, and, therefore, the testimony of witnesses who saw the testatrix and speak of her condition between the hours of four and ten o'clock becomes of the utmost importance.

The will in controversy was executed by the testatrix shortly after six o'clock on that evening. About an hour before the will was executed, William Koelhoffer, a priest, connected with the Catholic Church, and particularly with St. Mary's Abbey, administered the sacraments to her. His affidavit, which was introduced as testimony in the cause by consent of counsel, is to the effect that when he administered the sacraments to the testatrix she was conscious; that while there, he heard the question asked of the testatrix whether she wanted to make a will, and she replied in the affirmative. It was after the priest had departed that Philip J. Schotland, a reputable member of the bar of this state, came to draw the will. Schotland testified that he received a call on the telephone at about six o'clock from the appellant, who said that the testatrix desired to make a will, and that it was necessary that it should be done at once. Schotland had no previous acquaintance with the appellant, and it appears that his selection for the task was through the recommendation of a Mr. Silverstein, an architect. Schotland responded with haste to the urgent call, and when he arrived at the bedside of the testatrix, he found gathered in the room the appellant, a trained nurse and the appellant's wife. The testatrix was propped up in bed and in a reclining position. The appellant said to the testatrix: "This is the lawyer that I sent for you to draw your will. Now you can tell him what you want." After this introduction Schotland sat down on a chair by the bedside, and just then the appellant's wife asked the testatrix if she wanted to see Charles, referring to the respondent, to which she replied in the negative, and when next asked by the appellant whether Charles should be sent for, she replied "No." Schotland then told them all to leave the room, that he desired to get whatever information the testatrix had to give him from the testatrix alone, whereupon they left the room. Schotland

*86 N. J. Eq.*          In re McKinney's Estate.

further testified that he had difficulty at first making out what the testatrix was saying, and he requested her to repeat it again, which she did, and that he understood her clearly and that she told him that she wanted everything left to three people. And to illustrate the clearness of the mind of the testatrix at that time it will serve the purpose to give Mr. Schotland's version, in his own words, as to what took place between them:

"She told me that she wanted everything that she had to go to Frank McKinney, Annie Rache and Millie—she said 'Millie,' so I asked her what her full name was. She gave me the last name, but I couldn't make it out, so I said, 'Mrs. McKinney, where is Millie or Amelia.' She said, 'Here.' So I went to the head of the stairs and called for Millie or Amelia—asked, 'Who is Millie or Amelia?' Mr. and Mrs. McKinney and Miss Amelia Clark came up, so I called Miss Clark into the room and I asked Mrs. McKinney if that is the Amelia she meant. She said, 'Yes.' I then in Mrs. McKinney's presence got the full name; it was Millie or Amelia F. Clark—I don't quite recall now—and I told them to go. I told them they could go again and remained alone with Mrs. McKinney. I then wrote out all the written in parts of this instrument. After I got through I went to the head of the stairs and called for the nurse, asked to have the nurse come in, and then I did what I testified to on direct examination as to the execution of the will."

As to that the witness had testified:

"Miss Weston came into the room and I then, in Miss Weston's presence, read the entire will to Mrs. McKinney, asked her if that was exactly the way she wanted it; she said, 'Yes;' I then asked her if she wanted anybody else remembered in the will; she said, 'No.' I then said to her, 'Is that all you want, that everything that you possess should be divided into three equal parts, Annie Rache to get one part, Amelia Clark another and Frank R. McKinney another.' She said, 'Yes.' I then asked her who she wanted as executor, and she again repeated she wanted Frank McKinney as executor. I then held the will in front of her and asked her if this was her last will and testament; she said, 'Yes.' I asked her if she wanted Miss Weston and myself to witness her signature to this paper as her last will and testament; she said, 'Yes,' and Miss Weston propped her up with pillows, held her up—and I put the will on a book or something, I' forget just what it rested it on—and handed her a pen and she made her mark, Miss Weston and I both there looking on. I then, right alongside of the bed, in front of Mrs. McKinney and Miss Weston, signed my name and office address as witness, and Miss Weston signed her name right underneath mine and her address as witness, right alongside of the bed in front of Mrs. McKinney, who saw us do it, and we saw each other do it."

The testimony quoted bears not only the imprint of truthfulness, but, moreover, shows that Mr. Schotland acted in the matter with a proper conception of his duties and in a conscientious manner.

That the testatrix was conscious and was able to carry on a conversation intelligently at the time the will was executed is satisfactorily established by Helen Weston, the trained nurse and witness to the will, who, apart from her employment as a nurse, was a disinterested witness. She testified that the testatrix did not become unconscious until ten o'clock on Monday morning. She fully corroborated Schotland's testimony as to the consciousness of the testatrix as to her surroundings, her ability to carry on an intelligent conversation, her full comprehension and appreciation of the disposition that she was making of her property by the will she executed in the presence of the witness. There was other testimony coming from witnesses who might properly be termed interested witnesses, which tended to establish that the testatrix, at the time she executed the will, though physically weak and suffering, was mentally alert and fully understood the disposition that she was making of her property. The value and effect of that testimony need not be considered on this issue, in view of the fact that the affidavit of the priest, and the testimony of Schotland and the trained nurse, sufficiently establish the testamentary capacity of the testatrix at the time the will was executed. Their testimony stands practically uncontradicted. We are unable to find anything in the testimony of Dr. Phelan which shows the contrary. In this state of the evidence there was no reasonable basis for the finding by the prerogative court and the orphans court that the testatrix lacked testamentary capacity at the time she executed the will.

It is next argued for the respondent that the will was the result of undue influence upon the testatrix.

In support of this contention, it is asserted that the lawyer who drew the will was chosen by the appellant. The word "chosen" does not accurately express how it happened that Mr. Schotland was called upon to draw the will. That has been discussed in the earlier part of this opinion. Mr. Schotland was an utter stranger to the appellant and to Mrs. McKinney, and

the beneficiaries named in the will. Mr. Schotland took his instructions from Mrs. McKinney, and no one else. There is, therefore, no significance to be attached to the circumstance of his employment. It is further contended since it appeared that in a prior will made by the testatrix in 1909 she had made a bequest to a sister, who then resided in Albany, and in case she should predecease her, to her daughter, of the sum of $1,000, and gave to Amelia Clark $1,000, and the daughter of Mrs. Rache $500, and to the appellant $100, and to St. Bridget's Catholic Church $100, for masses for the repose of her soul, and the residue of her estate to the respondent, the fact that she made no provision in the present will for her sister or for the saying of mass for the repose of her soul, was irresistible evidence of undue influence. We think the will made by the testatrix was a most natural one for her to make under the circumstances. Her grandson, the respondent, had proven himself, by his conduct toward her, unworthy of her bounty. Neither the sister nor niece of the testatrix is here complaining. The testatrix made the same provision for Amelia Clark and gave to Mrs. Rache, instead of her daughter, the sum of $500. She gave to the appellant McKinney, to whom she was attached as a foster mother, the residue of her estate. The fact that she failed to make any provision for saying masses for the repose of her soul might readily be accounted for that she was willing to trust those who were beholden to her for what she had bestowed upon them to religiously see to that. We have been unable to discover anything in the evidence or circumstances of the case which in the slightest tends to uphold the contention of the respondent that the will was the result of undue influence.

The views herein expressed lead to the conclusion that the will of the testatrix was improperly refused admission to probate and that the decree under review in that regard must be reversed.

We have considered, in connection with this appeal, the appeal of the respondent from that part of the decree of the prerogative court which decreed that $628.69, being expenses incurred by the appellants in connection with their appeal from the orphans court to the prerogative court, be paid from the estate of Fredericka C. McKinney, deceased, and find the appeal to be without merit.

That part of the decree of the prerogative court directing such costs to be paid out of the estate is affirmed.

No. 78—

*For affirmance*—None.

*For reversal*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—14.

No. 85—

*For affirmance*—THE CHIEF-JUSTICE, GARRISON, SWAYZE, TRENCHARD, PARKER, BERGEN, MINTURN, KALISCH, BLACK, TERHUNE, HEPPENHEIMER, WILLIAMS, TAYLOR, GARDNER—14.

*For reversal*—None.