This is a contest over the probate of the last will and testament of Arthur Phillips, deceased. The contestant is the testator's second wife and widow. The will leaves the testator's home in Millburn and the sum of $6,500 to the widow and disposes of the remainder of the assets in trust for testator's three children and other members of his family. Prior to his death the testator provided for the contestant by gift of a home in Cuba and established two inter vivos trusts for her benefit.
The execution of the will was not challenged on the hearing nor was evidence introduced of fraud or undue influence *Page 258 
practiced or exerted upon the decedent. The contestant must therefore be deemed to have abandoned such grounds of objection to the probate of the will. The remaining objection is the charge that the testator lacked testamentary capacity at the time he made his will. The burden to prove testamentary incapacity is, of course, upon the contestant. In re McKinney's Estate, 86 N.J. Eq. 211; 98 Atl. Rep. 452; In re Bottier, 106 N.J. Eq. 226;150 Atl. Rep. 786; In re Craft's Estate, 85 N.J. Eq. 125;94 Atl. Rep. 606; In re Triebe, 114 N.J. Eq. 227; 168 Atl. Rep. 404.
Proof as to mental capacity at periods prior or subsequent to the time of the execution of the will may have some bearing upon the issue; but the point of time at which the testator's competence is to be tested is that of the execution of the will. Thus the testimony of persons such as the subscribing witnesses to the will who saw and observed the testator at the decisive period is of the highest probative force. O'Brien v. Dwyer, 45 N.J. Eq. 689; Buckman's Case, 80 N.J. Eq. 556; 85 Atl. Rep. 246; In reDelaney, 131 N.J. Eq. 454; 25 Atl. Rep. 2d 901.
The will in question was made on September 9th, 1943. Mrs. Phillips testified that the decedent was in good physical and mental condition up to the month of May, 1943, except for a stomach ailment; that in the month of May he suffered a slight stroke, as a result of which he became mentally incompetent; that from May until August in the same year he became steadily worse, so that by the latter part of August, 1943, he was permanently and completely mentally incompetent, and remained in that condition until his death in January, 1946. Her testimony in this regard is materially affected if not destroyed by the questionnaire which she filled out in her handwriting and submitted to the New Jersey State Hospital for the Insane shortly after Mr. Phillips went to that institution in 1945. She therein said that the date when she first noticed any symptoms of mental illness on the part of her husband was "about June, 1944." She described the decedent's condition at "about June, 1944" by saying "Mr. P. began to forget — people — names, facts — only at *Page 259 
times — other times remembered everything." And again in her own handwriting in that questionnaire she said that "In June, 1943, he was in Lahey Clinic, Boston, for complete check — outside of deficiency of hydrochloric acid in stomach they found him in good shape — mentally and physically." Mrs. Phillips, a trained nurse, prepared and submitted to the hospital authorities this statement in order to guide the doctors and other attendants in the treatment of her husband's illness. The witness either did not tell the truth then or she did not tell the truth at the hearing.
Dr. Edward Kessler treated decedent for stomach trouble for about ten years before the date of the will. He testified that the decedent was mentally all right up to May of 1943; that early in May of 1943 he had a slight cerebral accident; that this accident affected his mental condition during May of 1943; that he improved during June, but became steadily worse during July and August, and finally that by August of 1943 he was permanently and completely incompetent. The doctor did not see Mr. Phillips in September of 1943. On cross-examination the witness admitted that in his opinion after August of 1943 Mr. Phillips could have had lucid intervals, during which testamentary capacity may have existed.
Mrs. Phillips and Dr. Kessler were asked whether the testator could have written letters in longhand, dictated letters to his secretary, make out checks in full or in part, make entries on the stubs of his check book, engage in mortgage transactions and other transactions affecting real estate, discuss business affairs with his associates, and take part in social events with his friends. Both witnesses said he could do none of these things during the latter part of 1943. But letters written and dictated by Mr. Phillips, check book stubs and checks written out by him, real estate documents executed by him together with Mrs. Phillips, and memoranda concerning business transactions introduced into evidence, are all in direct contradiction of this testimony.
The witness, Dr. Bernstein, gave no opinion as to the testator's mental capacity. Dr. Dredge was asked a lengthy hypothetical question, but had not seen Mr. Phillips prior to *Page 260 
1945. The hypothetical question although allowed over objection did not include the voluminous evidence, both oral and documentary, which was later presented on behalf of the proponents. The evidential worth of such hypothetical testimony is questioned in the light of the authorities hereinafter set forth, and the testimony of persons who saw Mr. Phillips on the day the will was executed.
Fabbio Alvarez, a young man who lived at the home of Mr. and Mrs. Phillips during 1943, related a number of incidents which occurred during the summer of 1943. These incidents showed that Mr. Phillips, in the witness' opinion, had good days and bad days. He related such things as the decedent's difficulty in finding a particular radio commentator on the radio, his impatience at theatre performances which Mrs. Phillips and decedent attended, his lack of memory as to names and dates. On the other hand, the witness said that during his worse periods Mr. Phillips recognized people and indicated such recognition by "a particular kind of a smile." The witness was laudatory of Mr. Phillips' many acts of kindness and constant desire to be friendly anl helpful.
Proponents presented the testimony of a number of persons who saw and observed Mr. Phillips on September 9th, 1943, the day of the execution of the will. Both subscribing witnesses, as well as the attorney who prepared the will, testified that Mr. Phillips was on September 9th, 1943, in their opinion normal and competent to make a will. The testimony of these witnesses present at the time of the execution of the will is of much probative force as to the mental capacity of the testator at the time when he executed his will.
The subscribing witness Berg, and Mr. Nathan Bilder the attorney who prepared the will, had known Mr. Phillips for many years and were familiar with his habits, customs and mannerisms, and so in a position to judge his mental capacity at the time. Their testimony is that Mr. Phillips read the will in the presence of his counsel, paragraph by paragraph. When he reached that portion of the will which deals with the distribution of his stock in the National Oil Supply Company, he paused, questioned Mr. Bilder as to the correctness *Page 261 
of the disposition made, and upon being told to read further on in the document, continued his examination and then expressed himself satisfied that the disposition was in accordance with his previous will.
In addition to those persons who were actually present with the testator at the time when he executed his will, the testator's daughters, a business friend and the testator's personal secretary all gave it as their opinion that Mr. Phillips was mentally competent during the summer and fall of 1943, including the month of September, 1943. The testimony of these witnesses as to his conduct on various occasions recalled by them bears witness to his mentality on all such occasions. Letters dictated to his secretary by Mr. Phillips and typed by her for his signature were introduced in evidence. His secretary said Mr. Phillips was mentally competent and perfectly normal to carry on his business and personal affairs.
Arthur Phillips, Jr., the son of the testator, testified that his father was normal and perfectly competent during all of 1943, including the month of September, 1943, to carry on his business and personal affairs. He saw his father and spoke with him on September 9th, 1943, the day of the execution of the will. In his opinion his father was perfectly competent on that day to make a will.
The testator wrote a letter to his children in his own handwriting in the month of July, 1943, while he was at the Lahey Clinic, in Boston. On cross-examination Mrs. Phillips said that Mr. Phillips could not have written such a letter in July of 1943; that it was the type of letter written by him in 1941, when she and Mr. Phillips were in Cuba. But when confronted with proof that the letter was in fact written in July, 1943, from Boston, said, that he had written the letter but that she had dictated the letter to him.
Our courts guard the right of testamentary disposition jealously. They hold that this right may be exercised by a person of very moderate capacity. Cases in which the testator had been adjudicated insane by an inquisition and in which the jury found that the testator had been non compos mentis and without lucid intervals for a period of years and months *Page 262 
and where the will was made during such periods, the will was upheld. In re Coleman, 88 N.J. Eq. 284; 103 Atl. Rep. 521;affirmed, 88 N.J. Eq. 578; 103 Atl. Rep. 78; In re Rule, 125 N.J. Eq. 255; 5 Atl. Rep. 2d 64; American National Red Cross v.Lester, 129 N.J. Eq. 28; 18 Atl. Rep. 2d 295.
In In re Ratti, 128 N.J. Eq. 15; 15 Atl. Rep. 2d 616, testatrix suffered from senile psychosis, a deterioration of the mind, with loss of memory and paranoid ideas. We there held that while it may be assumed that Mrs. Ratti was insane in a medical sense, she possessed testamentary capacity at the time she made her will.
The testator in May, 1943, had a slight cerebral accident — arteriosclerosis, hardening of the arteries. Even assuming the progressive effect on the brain and the rest of the body of the deceased, I do not find after considering all of the testimony, anything that would lead me to the belief that there was such impairment of the decedent's mental capacity at the time of the execution of the will as to render him mentally incompetent to make the same.
The will will be admitted to probate. *Page 263