250 N.J. Super. 438 (1991)
594 A.2d 1367
IN THE MATTER OF THE ESTATE OF LEONARD J. FRISCH, JR., A MENTALLY INCOMPETENT PERSON.
Superior Court of New Jersey, Law Division Ocean County, Probate Part.
Decided June 13, 1991.
Douglas J. Gatta for Leonard Frisch and Charlotte Frisch (Abrams, Gatta, Rosen, Rosenbloom & Sevrin, attorneys).
*439 PISCAL, J.S.C.
This matter comes before the court by way of an application for a plenary hearing made by Charlotte Frisch, guardian for Leonard Frisch, Jr. On April 4, 1991 an order for a plenary hearing was signed. May 16, 1991 was set as the return date to decide:
(a) whether Leonard Frisch, Jr. has returned to "general competency"; and/or
(b) whether Leonard Frisch, Jr. has sufficient competency to make a will.

The Factual and Procedural History.
Leonard Frisch, Jr., hereinafter Leonard, was severely injured as a result of an accident in July 1979. He instituted litigation that eventuated in a favorable settlement of the personal injury action in his favor. In November 1980, he was declared "physically and mentally incompetent" by Harold Kaplan, J.S.C. Subsequent thereto, there was litigation relating to his marital status which included a final judgment of divorce and incorporated by reference a settlement of other claims in a final judgment set forth in Superior Court, Law Division, Ocean County, Probate Part, docket no. 60418. Christopher Frisch, the son of that union and Susan Frisch, the former spouse, were given notice of this hearing, but did not appear. Leonard is now age 50.
The instant proceedings were initiated by Leonard's guardian and his natural mother, Charlotte Frisch, for a determination that he has returned to competency; or in the alternative, that he is competent to execute a will. All interested parties were notified and no objection was filed nor appearances made by any other party.

The Hearing on May 16, 1991.
At the hearing held on May 16, 1991, Douglas J. Gatta, attorney for the guardian, recited parts of this procedural *440 history on the record. James Douglas McMahon was then presented as a witness. He testified that he was a psychologist, licensed in New Jersey and a registered rehabilitation agent in New Jersey. He is a graduate of Spring Hill College (a Jesuit college in Alabama) with a masters degree from the University of North Carolina, a doctorate in psychology from Montreal University and is a diplomate in the Society of Psychologists. He is a member of the American Psychological Association, the New Jersey Psychological Association, the Canadian Psychological Association and the National Rehabilitation Association. He is also a licensed psychologist in Canada.
Dr. McMahon has been in active practice as a psychologist since 1962 with a varied work experience. He has taught psychology at Seton Hall University, the University of North Carolina and has lectured in this country, in Canada, at the Soviet Academy of Science in Moscow and the Israeli Academy of Science in Tel Aviv.
Dr. McMahon was found to be qualified as a psychologist.
He testified that he was asked by the family shortly after the accident of 1979 to "orchestrate" a rehabilitation plan. At the time Leonard was in a vegetative state. He explained that this means there was no input of information into his brain, no processing of information nor any output.
Dr. McMahon, working in conjunction with general medical coordinator, Dr. Nicholas Yatrakis, and psychiatrist, Dr. Laszlo Litkey, put in place a plan that moved Leonard from the hospital to Kessler Institute, then to Toms River Convalescent Center, and finally to his mother's care at home. He went from a vegetative state where his prognosis was bleak to his present condition.
The most dramatic change occurred after 1986 when Leonard left the convalescent center to enter his home to be cared for by his mother and guardian. In 1988, a computer was placed into his home. At the time he was reading at 50% of second-grade *441 level. Within two years he achieved a score of 50% of eighth-grade level and now he is at 90% of 12th-grade level.
Dr. McMahon was of the following opinion:
His long-term memory is less spotty then it was. That is to say that the capacity to put information into his neurological data bank and to retrieve it after other information has taken place. His memory for short-term information represents a bit of what we would call dysarthria which essentially means there is a delay in giving feedback, so that his answers may not be as spontaneous as some others but they're quite adequate, given the processing time involved.
Q. So your conclusion is that Leonard has memory?
A. Leonard has most adequate short- and long-term memory.
....
He has the capacity from a psychological point of view, and from that psychological point of view, we try to provide evidence for the physician to help make that judgment or ultimately to make that judgment, frankly.
In answer to your questions, yes, he has such capacity from a psychological point of view.
Asked by the court about the recent test, the witness indicated it was the Michigan test for asphasia, the reading subsection, in which Leonard scored 90% of 12th-grade level in March 1991.
When discussing another standard test, Dr. McMahon was forthcoming and candid, advising that:
When you put the verbal intelligence and the performance intelligence together, you get a full scale IQ of 87, which is dull normal.
Q. So what you're saying is that physically  he is less apt physically than he is mentally?
A. Correct. He is, in my opinion, still dependent physically.
All in all, I concluded from the testimony of Dr. McMahon that Leonard made remarkable strides in cognitive rehabilitation, was aware of his family, friends, assets and property, but was physically limited as far as being able to take care of his daily living needs.
Dr. Laszlo Litkey, who testified next, first revealed an interesting medical background. Born in Hungary, he was educated at, and received a medical degree from, the University of *442 Budapest in 1952. He completed a four-year residency in neurology and came to the United States in June 1957.
He served an internship at St. Mary's Hospital in Saginaw, Michigan, then worked at the Trenton Psychiatric Hospital from 1960 to 1963, obtained his United States citizenship and passed the New Jersey and Ohio examination for license as a physician in 1963. He remained at the Trenton Psychiatric Hospital, later called the Trenton State Hospital, and was later chief of service when it was called the Forensic Hospital, Vroom Building (Forensic Psychiatric Hospital). He has testified in numerous trials with regard to competency and sanity.
Thereafter, he spent 20 years as a practicing psychiatrist with Fair Oaks Hospital, where he evaluated and treated patients with various mental illnesses. He retired from there in 1987 and does consulting work now. He has been qualified as a "psychiatric expert" in 18 of 21 counties in New Jersey.
The doctor was qualified as a psychiatrist. He described Leonard's condition in 1980 as follows:
At the time, his memory was impaired. He had violent temper tantrums and outbursts. He was struck by fears, depressions and unmodulated and unprovoked anger, various delusional ideas, partially religious type.
His speech was seriously impaired, he has right sided paralysis of his body or paresis.
... He was totally dependent on nursing care.
As the record reveals, Doctor Litkey was obviously delighted with the progress Leonard had made since 1980!
Q. So based upon your experience with Leonard and the care that you have provided and that interaction that you've been talking about, does Leonard have memory?
A. Oh, yes. As far as memory, in fact, he shows up with his memory. He told me where his parents' old house was, to the address. He  knows his telephone number.
He knows the names of his children, the ages of his children, his mother, father, brother, sister.
Of course, he knows Doctor McMahon. He knows anybody who works with him. He knows all the nurses.
And he knows current events.
Just a few days ago I was with him, and we were talking about an uncle of his. And I was amazed how well he recalls what the uncle was doing.

*443 We were talking about the Middlesex County Workhouse. For some reason the conversation came up, because his parents used to live close to where the workhouse is on 130. [Route 130]
And I said, Well, you know, Leonard, I used to go to the workhouse several  you know, in the past. And he said, My uncle have worked there. I'm not sure, but he might have been the Warden
MR. LEONARD FRISCH  He was.
A. He mentioned his name, and so
MR. LEONARD FRISCH  Len Hefner.
A.  that gives one an understanding that this man doesn't only have recent memory, but has fairly good remote memory as well.
Q. And as a result of those conversations have you formed an opinion as to whether or not he's aware of the property and his estate that he owns?
A. Oh, yes.
In fact, I asked him questions about it, about, you know, whose property it is, when was it purchased, were there any additions, and he showed me all the equipment in the house particularly for his use, the special bathroom facilities for him, and he gave me tours of the  of the house, pointing out that there is a swimming pool on the outside, what his brother did, certain things on the house, et cetera, et cetera.

And he is fairly well aware of who his relatives are, what  if not down to the penny, what moneys are available, and what he would like to do.
Q. Doctor, based upon your knowledge and experience and your treatment of Leonard, have you been able to form an opinion with a reasonable degree of medical certainty as to Leonard's competency, mental ability?
A. Yes, sir.
Q. And what is that?
A. Well, primarily, his wish conveyed to me was that he would like to make another will. I found him perfectly competent to do that. And as far as his general level of competence, he is physically not competent as far as he is not completely independent. There are certain things he cannot do for himself.
Also, as far as the issues because of the tremendous complexity, he would probably not be able to deal with every single aspect of complex situations.
But, again, I reemphasize, that as far as his competency to make a will, I have no doubts in my mind, sir, and I can tell you with reasonable medical certainty that he is competent.
The court probed further in a colloquy about competence:
Q. What is your definition of competence, Doctor?
A. Judge, having been around the legal profession for this long, certain things rub off; that is, that competence is always an answer to a question, competence to do what?
Q. I see.
A. There is competence to be a witness, which is a very low level of competence.

*444 One understands the spoken words and understands that the person is obligated to tell the truth, not necessarily to do so, but know the obligation, is competent to be a witness.
Competent to execute a will is also a relatively low level of competence. One has to know the relatives, the relationship between himself and the environment, the extent of one's worldly possessions and have a reasonable understanding of what he wants to do with it.
Competence to proceed in a criminal trial, it's another level of competence. One has to know that he is charged with an offense. He has to know that the principles of the Court, has to know that there are various choices available for him as to the pleas, what his rights are, and what rights he is willing to exercise.
He will have to be able to cooperate with counsel, and et cetera, et cetera. I can tell you all, from A to H, all the levels of competence.
Competence to enter into a contract relationship, et cetera, et cetera. These are all various levels of competence.
So competence is a complex, but not terribly complex legal concept.
Q. Your opinion is that he is competent to make a will, knowing that the law in New Jersey with regard to the making of wills states that one ought to know the natural objects of their bounty; that is, the people and relatives, knows the  to some extent, not in exact detail, but the nature of their  the property that they have to dispose of, and knows the interrelationship between those objects of the bounty and the interrelationship with the property.
And you feel, in your opinion, that Mr. Frisch has that level of competency?
A. Yes, sir.
Q. Okay. Let me ask you this: The rule with regard to declaring somebody to be incompetent states that they ask of a physician to give an opinion as to whether the person involved is fit and able to govern themselves without actually defining what that means.
Do you have an  do you often, in your profession, work with that type of standard? The competent to incompetent in a civil situation such as we have here?
A. Yes, sir. I do. And this
Q. What is your understanding of someone being fit and able to govern themselves in that context?
A. What is my understanding, sir, is that although they might not be able to execute all the activities which are required to govern one's self, they can competently choose individuals who can carry out the activities which are involved in governing one's self.
And again, of course, that's all a relative thing, because it depends.
If I am on welfare, basically, penniless, there is not an awful lot to govern. If I am sitting on a top of a multimillion dollar estate with various complex investments and tax issues, to govern myself is a much higher function than if I'm on welfare, and all I know that I get my welfare check, this is how much goes for rent, this is how much goes for food, and the rest of it is food stamps.

*445 Q. But a competent man who had the millions of dollars, not knowing any tax law, would go and consult ...
A. And find a tax expert who will not put him in jail for not paying the taxes.
Q. You -A. But I am not Donald Trump, so I am not too worried of that.
Q. You would agree though, that Mr. Frisch, though, would not have the ability to govern himself or manage his own affairs from a physical point of view?
A. That's correct, sir.
Q. But you think he would meet that standard from a mental point of view?
A. Yes, sir.
Q. To be able to govern himself and manage his own affairs from a mental point of view?
A. Yes, sir.
Leonard then testified. He rose from the chair at the counsel table on his own and walked, (with some hesitation), to the witness chair and was sworn. He answered the questions posed by Mr. Gatta with a slight hesitation. The questions took him through his accident to the present time and a recitation of his current daily routine; a recitation of his current family members, their ages and their general location.
He knows that he owns a house (the product of his personal-injury settlement), a van, and has approximately $180,000 in the New Jersey National Bank. He recently acted as a "greeter" at the Saint Barnabas Episcopalian Church which he attends. He identified the will he recently went over in Mr. Gatta's office. He said this will expresses his wishes and signed it here in court, as the record will reveal.
The court asked him questions which Leonard answered as readily as those from Mr. Gatta. In order to test his memory and ask a question that could not have been rehearsed, the court probed his background. Upon being told Leonard graduated from South River High, the judge, being aware of a famous sports figure from that school, asked Leonard if he knew the name of that famous quarterback. Leonard supplied the answer "Joe Theisman."
The court then viewed during the lunch hour a video tape taken on May 3, 1991. The tape, which was taken at Leonard's home, runs approximately 40 minutes. Mr. Gatta is shown on *446 the tape speaking with Leonard. The tape is in color with sound. Leonard held a conversation with Mr. Gatta in which Leonard talked about his nurses, the town he lived in and his days at the Toms River Convalescent Center, (he did not like it there!). Leonard demonstrated his ability at playing a computer game, talked about Susan, (the "wife" he divorced; he still argued a legal position taken in the case that he was not "married" because she had an Alabama divorce that was not legal prior to their ceremony).
During the tape discussion, Leonard demonstrated an awareness of current events (McDonalds' has a low cholesterol hamburger on the market). He talked about a recent trip to the Quaker-Bridge Mall with his nurse and dinner at "China Moon" restaurant. Dr. Litkey came to "visit" and also spent a few minutes speaking with Leonard, demonstrating Leonard's mental capacity to hold a conversation on an adult level.
At the court's request Charlotte Frisch testified. She stated that every day her son shows a little bit more progress. She has no problem with continuing as guardian. The family has discussed the future. When she is no longer able to serve, Leonard's brother Henry, who lives at home with them, is the next candidate to be Leonard's guardian.
Then on the record the concept of a "conservator" was discussed and Leonard agreed that he would consent to having his mother Charlotte serve in that event.
At the conclusion of the hearing the judge expressed the opinion that, based on the testimony, Leonard was competent.
An affidavit was submitted by Dr. Yatrakis, sworn to on May 28, 1991, along with a letter from the doctor dated May 20, 1991, each of which is made an appendix to this opinion.

Findings of the Court.
Leonard is competent. An analysis of the current state of the law in New Jersey reveals that before an individual who has previously been declared incompetent may execute a valid *447 will, there must first be a judgment adjudicating his return to competency. N.J.S.A. 3B:12-27 stands for the proposition that if an individual executes a will during a period when he has been adjudicated incompetent, his will is not valid, (the will cannot be admitted to probate), and his property will pass as if he died intestate.
If a mental incompetent dies intestate or without any will except one which was executed after commencement of proceedings which ultimately resulted in a judgment of incompetency and before a judgment has been entered adjudicating a return to competency, his property shall descend and be distributed as in the case of intestacy. [N.J.S.A. 3B:12-27]
In In re Estate of Bechtold, 150 N.J. Super. 550, 376 A.2d 211 (Ch.Div. 1977), aff'd 156 N.J. Super. 194, 383 A.2d 742 (App.Div. 1978), certif. den. 77 N.J. 468, 391 A.2d 484 (1978), construing this statute's predecessor, N.J.S.A. 3A:6-39 (which contained almost identical language) was upheld as not violative of due process or equal protection. In the Bechtold case, the testator, Walter Bechtold, had been adjudicated mentally incompetent nine months before he executed his will. It was determined in a will contest, after his death, that the will was not entitled to probate, and Bechtold's property would pass by intestacy. 150 N.J. Super. at 552-553, 376 A.2d 211.
The argument was raised in Bechtold that in New Jersey, the standard for testamentary capacity is not as strict as for mental competency, and therefore, the statute merely sets up a rebuttable presumption as to the former. Id. at 553, 376 A.2d 211. The court found however, that,
The legal effect of an adjudication of incompetency is that the ward is divested of all control and management of his property. Lommason v. Washington Trust Co., 140 N.J. Eq. 207, 209 [53 A.2d 175] (E. & A. 1947). The only way a ward can be revested with legal capacity to manage his own affairs is through an adjudication that he has returned to competency. [Ibid.]
The test for "testamentary capacity" in New Jersey has a relatively low threshold.
If the testator is capable of recollecting of what his property consists, and who, either in consequence of ties or blood or friendship, should be objects of his bounty and has a mind sufficiently sound to enable him to know and understand what disposition he wants to make of his property after his death, he is *448 competent to make a valid will. [In re Phillips, 139 N.J. Eq. 257, 50 A.2d 862 (1947)].
The test for mental competency is somewhat more demanding. Mental incompetence is defined in N.J.S.A. 3B:1-2 as follows:
"Mental incompetent" means a person who is impaired by reason of mental illness or mental deficiency to the extent that he lacks sufficient capacity to govern himself and manage his affairs.
By way of comparison, an individual would seemingly need more mental capacity to manage and govern his own affairs, than to know the nature and extent of his property, and the natural objects of his bounty. Nevertheless, the holding in Bechtold and N.J.S.A. 3B:12-27 preclude a finding that Leonard has the ability to execute a valid will based on his testamentary capacity alone. In other words, a return to competency is mandated before the issue of testamentary capacity can be reached, rather than vice versa.
In a brief commentary in the New Jersey Bar Journal (Smith, "Wills, Lunatics and N.J.S.A. 3A:6-39," 69 New Jersey Bar Journal 48 (Fall 1974), the author concludes that the statute sets up a rebuttable presumption of testamentary capacity.
Whether this is a true statement of the law or whether the legislature meant that, in the absence of an adjudication of a return to competency, there will be no litigation regarding competency after the incompetent's death (a salutary measure to prevent litigation between disappointed heirs at the expense of the estate), is of no moment here because, in this instance, Leonard is able to come to court and demonstrate his ability and/or lack of ability.
R. 4:86-7 governs an individual's return to competency. The rule requires testimony in open court. The instant matter was heard without a jury. Testimony was taken from two experts, and a third expert submitted a letter and an affidavit. All three experts supported Leonard's return to competency.
*449 The court was impressed with Dr. McMahon's qualifications, his abilities and his care for his patient. More important to the issues in this case, Dr. McMahon testified that Leonard is very aware of his family, the extent of property, and how he wishes to dispose of his property. Dr. McMahon also testified that Leonard is "competent" in that he had adequate short-term and long-term memory and is "self directed" and not overly influenced by others around him.
Next, Dr. Litkey testified. Dr. Litkey is a licensed medical doctor with an extensive background in psychiatry, especially as it relates to legal issues. Dr. Litkey also testified as to Leonard's remarkable recovery. He had examined Leonard nine times in an 11-year period. He testified that Leonard clearly knows the interrelationship between the objects of his bounty and his property. Furthermore, although the doctor felt that Leonard might have some physical incapacity which would require him to be assisted in everyday affairs, he did testify that Leonard would be able to govern himself and manage his affairs from a mental point of view.
Dr. Nicholas Yatrakis, submitted an affidavit in support of Leonard's ability. He essentially confirmed the opinions of the two doctors regarding Leonard's "competency" and testamentary capacity.
Finally, Leonard testified. The court examined him in an attempt to lead him away from any possibility of rehearsed testimony. However, Leonard gave correct answers to questions which required long-term and short-term memory responses. He unequivocally demonstrated to the court that his testimony hadn't been rehearsed.
A clear record has been presented through the testimony of the experts and Leonard himself. The evidence presented reveals that not only does Leonard have testamentary capacity, but he is also entitled to be adjudicated competent.
R. 4:86-1 et seq. sets forth the procedures that are used to establish that one is mentally incompetent.
*450 I find that Dr. Litkey and Dr. Yatrakis meet the standards set forth in N.J.S.A. 30:4-27.2t as reputable qualified physicians.
I accept their opinions as to the mental capacity of Leonard. Moreover, I am impressed with the testimony of Dr. McMahon who, though not a "physician" within the meaning of the aforesaid statute, has impressive qualifications as a psychologist and intimate experience with the patient. Of even more importance, I have seen and examined Leonard. Based on my observations and the questioning set forth in the record, I find that he meets the statutory test for "mental competency." I find that he meets and exceeds the standards for competency to make a will.
Were it not for his continued physical disability, which status may improve in the future, I would declare that he is "fit and able" to govern himself and to manage his own affairs. R. 4:86-2(b).
Therefore, I declare that Leonard Frisch, Jr. has returned to competency (R. 4:86-7). In view of the physical limitations as set forth in the testimony of the witnesses, I will appoint his mother, Charlotte Frisch, as his conservator. N.J.S.A. 3B:13A-1.
Mr. Gatta shall prepare an order in conformance with this opinion. The opinion and order shall be served on all interested parties as was the notice of hearing. The formalities of R. 4:86-11, Appointment of Conservator, shall be observed.